**Roosevelt GREEN, Jr.,
Petitioner-Appellant,**

v.

**Walter D. ZANT, Respondent-Appellee.**

No. 82–8773.

United States Court of Appeals,
Eleventh Circuit.

July 30, 1984.

Rehearing and Rehearing En Banc
Denied Sept. 13, 1984.

John Charles Boger, New York City, for petitioner-appellant.

Virginia H. Jeffries, Wm. B. Hill, Jr., Asst. Attys. Gen., Atlanta, Ga., for respondent-appellee.

Before TJOFLAT, VANCE and CLARK, Circuit Judges.

VANCE, Circuit Judge:

This capital case is again before this court following a limited remand for an evidentiary hearing concerning the discharge of a juror after the jury had commenced its deliberations. Since the facts and procedural background of this case are set forth in this court's earlier opinion, *Green v. Zant,* 715 F.2d 551 (11th Cir.1983) [*Green I*], we turn directly to a consideration of the issues raised by petitioner. We conclude that all of petitioner's claims are without merit and therefore affirm the judgment of the district court denying the writ.

## I. THE DISMISSAL OF JUROR TODD

When this appeal was first argued, petitioner contended that one of the jurors at his resentencing trial, Mrs. Dorothy Mae Ponder Todd, had been replaced by the trial judge without an adequate inquiry into her ability to continue. Specifically, petitioner alleged that the jury had returned to the courtroom after several hours of deliberations to ask the judge whether petitioner could be sentenced to life imprisonment without possibility of parole. The judge informed the jury that he could not respond to this question, and the jurors filed out into the hallway to return to the jury room. At this point, according to the testimony of petitioner's counsel and a jury consultant retained by the defense, Mrs. Todd apparently experienced an hysterical reaction and fell to the floor, repeatedly crying "I can't do it!" in a voice that was audible within the courtroom itself. Following a colloquy between the trial judge and the jury foreperson, Mrs. Martha McGee, Mrs. Todd was discharged and replaced by an

alternate. Petitioner also produced an affidavit from Mrs. Todd in which she stated that she had been one of two jurors holding out against the death penalty, that she "had every intention of continuing as a juror" even after her collapse, and that the trial judge had not questioned her to ascertain her condition before ordering her replacement.[1]

On the basis of these allegations, this court noted that "Green has stated a colorable claim of constitutional magnitude.... The circumstances of the dismissal of juror Todd raise the suggestion that her refusal to impose the death penalty was a factor in her dismissal." *Green I,* 715 F.2d at 555–56. Since we concluded that neither the state habeas court nor the state supreme court had made any findings of fact on this issue, *id.* at 558, we remanded the case to the district court for an evidentiary hearing. In accordance with our instructions, the district court subsequently held a hearing and issued its findings of fact, which were certified to this court in an order dated January 13, 1984. On the basis of the extensive testimony presented at the hearing, the district court held that the facts adduced "permit no other conclusion but that there existed a sound basis for the exercise of the trial judge's discretion in replacing Mrs. Todd with an alternate juror.... Accordingly, petitioner cannot constitutionally complain that he was prejudiced by the trial court's refusal to hold a

hearing...." *Green v. Zant,* No. 82–161–2–MAC, slip op. at 12–13 (M.D.Ga., Jan. 13, 1984). Petitioner challenges the district court's findings, but we conclude that they are not clearly erroneous.

Petitioner contends that the district court's findings should not withstand our scrutiny because they "necessarily rest on [the] acceptance of certain deposition testimony from foreperson Martha McGee that is not only unworthy of belief but is contradicted on key points by every other witness with knowledge of these events." Mrs. McGee testified that she was waiting for the elevator in the hallway outside the courtroom with the other jurors when Mrs. Todd suddenly collapsed.

> At that point, I'm in front, and I turn around, and I see Mrs. Todd on the floor; and at that point, she was in a state of emotion that she's jerking and her head is going from side to side, and her eyes—I could almost see the whites of her eyes, and she was not totally flat on her back, but she was sort of on the side, lying with her right side to me. She was muttering, and she was in a terrible state; and at that point, I knelt down and touched her on her shoulder, which would have been her right shoulder, and I hear her say "I can't go on," and I touched her on her shoulder and looked at her, and she looked at me, and I said,

---

1. In her affidavit, juror Todd stated:

> I reside at 71 Jones Street, Forsyth, Georgia. I am employed by the Bibb Company in Forsyth.
>
> I was selected to serve as a juror in the case of the *State of Georgia v. Roosevelt Green* in November of 1979, in the resentencing trial.
>
> The only issue to be determined was whether Mr. Green should receive a life sentence or the death penalty.
>
> I heard testimony as a juror for the entire sentencing trial as charged by the Court.
>
> After a lunch break on Saturday, November 10, we began deliberations.
>
> I heard all the evidence and participated fully in the deliberations. A secret ballot was taken by the foreperson. The vote was 10–2 in favor of the death penalty. I voted against the death penalty.
>
> Just before 5:00 p.m., the jury returned to the courtroom with two questions for the

> Court concerning whether life imprisonment meant no parole and whether it was possible to have testimony of a witness read to us.
>
> After the judge said what he did, I felt that the other juror would be more likely to give the death sentence because he thought that Roosevelt Green would be paroled.
>
> We then went out of the courtroom. Before I got on the elevator, I collapsed. I had never collapsed before in my entire life.
>
> I had every intention of continuing as a juror. I don't remember ever making any statements to anyone asking to be taken off the jury.
>
> The judge never asked me personally whether I could continue. I was capable of continuing to serve as a juror and I'm sure that I would have standed [sic] firm with my convictions.

"Do you want to be replaced," and her answer to me at that time, and her head is still going and moving, and she is still trembling terribly bad, and her answer is "Uh-huh, uh-huh, uh-huh."

Mrs. McGee indicated that Mrs. Todd made these remarks "in a whisper type tone" that would not have been audible in the courtroom or even to the other jurors standing around in the hallway.

■ Petitioner charges that Mrs. McGee's testimony is not worthy of credence, noting that no other witness testified to observing Mrs. McGee bending over Mrs. Todd as she was lying on the floor, that no other witness recalled Mrs. Todd saying "I can't go on," and that several of the witnesses indicated that Mrs. Todd was unconscious while lying on the ground. We must expect some inconsistencies, however, when witnesses are interrogated in exhaustive detail concerning their recollections of a brief and startling incident that occurred almost four years earlier. The testimony of several other witnesses supplied at least circumstantial support for Mrs. McGee's account. Two of the other jurors, Mrs. Emmie Adams and Mrs. Belle Schell, as well as one of the bailiffs, Mrs. Mary Sewell, recalled that Mrs. Todd was mumbling or muttering something after she fell to the floor. While they all stated that they could not understand what she was saying, this would be consistent with Mrs. McGee's statement that Mrs. Todd was speaking in an almost inaudible voice. Mrs. Sewell's testimony indicated that she believed Mrs. Todd had first passed out and then had come to and begun rolling around on the floor, which would explain why some witnesses recalled Mrs. Todd as unconscious while others reported her in a semi-conscious or hysterical state. Mrs. McGee's testimony therefore appears generally consistent with the recollections of the other witnesses. Under these circumstances we clearly cannot hold that the district court erred in accepting her version of events.

Other testimony at the evidentiary hearing buttresses the district court's conclusion that the trial judge did not abuse his discretion in dismissing Mrs. Todd. The trial judge himself testified that he had no way of knowing Mrs. Todd's position in the sentencing deliberations, and this claim was supported by Mrs. McGee's testimony. In our initial opinion, we took note of the possibility that the trial judge might have been aware of Mrs. Todd's position in the jury's deliberations. This view was based on petitioner's claim that Mrs. Todd fell to the floor crying "I can't do it!" in a voice that was audible within the courtroom. This claim was completely discredited at the evidentiary hearing, however. The only witnesses who took this view were petitioner's defense counsel and a jury consultant working for the defense team; the other witnesses either indicated that Mrs. Todd said something else or stated that they were unable to understand her, although the other jurors and the bailiffs were much closer than those still inside the courtroom.

■ Once the suggestion that the trial judge knew of Mrs. Todd's position on petitioner's sentence is dispelled, we are left with no other reason for his actions than his apparent wish to proceed expeditiously with the jury's deliberations. The jury in fact returned to its deliberations after Mrs. Todd was discharged and succeeded in reaching a verdict later that evening. Since Mrs. Todd herself testified that she would not have been able to continue as a juror at that time, we conclude that the trial judge had a sound basis for his decision to discharge Mrs. Todd and that no prejudice resulted to petitioner from the trial judge's failure to question Mrs. Todd personally before dismissing her.

## II. THE *ENMUND* ISSUE

■ Petitioner asserts that the imposition of the death penalty in his case is unconstitutional under the principles set forth by the Supreme Court in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In *Enmund*, the Supreme Court held that the eighth amendment does not permit the death penalty to

be imposed on a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.* at 797, 102 S.Ct. at 3376. Petitioner claims that he falls within the *Enmund* rule because witness Thomas Pasby testified that Moore claimed to have committed the murder after sending petitioner away "to get some gas," and that petitioner "didn't know he was going to shoot her."

This case is distinguishable from *Enmund* in that it was presented to the jury on a malice murder theory, rather than as felony murder. The prosecutor contended in his closing argument that Green fired the fatal shots, noting that Green was driving the victim's car and was in possession of the murder weapon when he was arrested in South Carolina, and that he had told his girl friend that "he shot or he killed a girl somewhere in Georgia." The trial court instructed the jury on the elements of malice murder and also informed them that they could not find the defendant guilty unless they found "that he was present at the scene of the alleged crime and his presence is an essential element of the crime as alleged in the indictment." Even Pasby's testimony indicated that Green had been a full participant in the robbery of the Majik Market where the victim, Teresa Allen, worked as a cashier, as well as in her subsequent abduction and rape, and that he later assisted Moore in disposing of her corpse. The jury in this case was squarely presented with an indictment charging malice murder; it was carefully instructed on the elements of the offense; and there was evidence in the record to support its verdict. We must therefore conclude that the jury's decision finding Green guilty of malice murder forecloses us from considering petitioner's *Enmund* argument.

### III. THE *WITHERSPOON* ISSUE

■ Petitioner next contends that six potential jurors were improperly excused during the voir dire preceding his second sentencing trial because they did not indicate that they were automatically opposed to the imposition of capital punishment in all circumstances, as required by *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The record clearly demonstrates, however, that the court committed no error. Jurors Benjamin Hill, Shirley Alford, Lucy Crowder, Lessie Passmore, Jr., and Grady Watson all answered affirmatively when the trial judge asked, "Are each of you saying that no matter what the evidence showed, no matter what type of crime it was, no matter how it occurred or anything about it, that there is no possible way in this world that you would ever vote to impose the death penalty?" All five of these jurors were then subjected to further, dogged interrogation by defense counsel, which failed to elicit any suggestion that they were other than unalterably opposed to the imposition of the death penalty under any circumstances.

Petitioner focuses most of his attention on the case of juror Fannie Mae Watts, who did not step forward when the prosecutor first put the *Witherspoon* question to the panel. Mrs. Watts was also questioned extensively after she subsequently indicated that she did not believe in the death penalty, and in response to defense counsel's inquiry, "Do you feel there would ever be a circumstance, any circumstance at all under which you would even be able to consider a death penalty?" she replied, "No, I don't." Because all six of these jurors made it clear that they would not consider imposing the death penalty under any circumstances, their exclusion was proper under the principles set forth in *Witherspoon*.

### IV. THE MITIGATING EVIDENCE ISSUE

■ Petitioner further alleges that he was denied the opportunity to present important mitigating evidence as a result of the district attorney's refusal to cooperate in taking the deposition of Father William James, a Montgomery priest who had been the head of a foster home where petitioner once lived. The facts surrounding this con-

tention appear to be as follows. At the beginning of the trial, defense counsel notified the court that he desired to call Father James to supply mitigating testimony, but suspected that he might be unavailable as a witness except on a date when the prosecution would still be presenting its case in chief. The trial judge indicated that he had some concerns about disrupting the orderly flow of the evidence and also wanted to ensure that the state had an adequate opportunity to cross-examine Father James. He then announced, "Let's do it like that, if the state's not through, I will send the jury to the room and put him up and let him say what he wants to say and let him be cross examined and then at the proper time, I will let you introduce that record."

Several days later, as the court prepared to adjourn for the day, defense counsel announced that he wished to "perfect the record on Father James." He then informed the court:

> Father James came to Monroe County last night and was here this morning and at lunchtime I asked the district attorney about taking this man's deposition and the district attorney retorted and responded and said that Father James could wait around like any other witnesses and he didn't care if he had to wait until next Wednesday and that he wasn't going to agree to any deposition now and Father James had to go back to his other appointment and is not available anymore . . . .

The record therefore clearly reveals that defense counsel failed to approach the court about excusing the jury so that Father James could testify while he was still available to do so. The trial judge's earlier remarks did not indicate that it was necessary for petitioner to secure the state's consent before proceeding to depose Father James, but simply that the judge wished to ensure the state an adequate opportunity for cross-examination. Petitioner was therefore deprived of Father James' mitigating testimony not as a result of the actions of the district attorney or any rulings by the court, but because defense counsel failed to comply with the reason-

able instructions issued by the trial judge earlier in the proceedings.

This case is therefore distinguishable from the precedents cited by petitioner. In cases such as *Lockett v. Ohio,* 438 U.S. 586, 604–05, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978) (plurality opinion), *Goodwin v. Balkcom,* 684 F.2d 794, 798–803 (11th Cir.1982), *cert. denied,* 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983), *Spivey v. Zant,* 661 F.2d 464, 469–72 (5th Cir. Unit B 1981), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982), and *Chenault v. Stynchcombe,* 581 F.2d 444, 447–48 (5th Cir.1978), the issue was whether the trial court had employed jury instructions that either precluded the consideration of some types of mitigating evidence or were insufficiently clear as to the proper role of mitigating circumstances in the jury's deliberations. In *United States v. Goodwin,* 625 F.2d 693, 702–03 (5th Cir.1980), *United States v. Hammond,* 598 F.2d 1008, 1012–15 (5th Cir.), *modified,* 605 F.2d 862 (5th Cir.1979), and *United States v. Henricksen,* 564 F.2d 197, 198 (5th Cir.1977), the defendants claimed that government agents had improperly pressured potential defense witnesses to discourage their testimony at trial. Petitioner's claim is clearly not comparable to those presented by either of these two lines of cases, and we therefore conclude that his argument on this ground is without merit.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner also charges that the performance of his defense counsel at his second sentencing trial failed to meet minimum standards of constitutional acceptability. Specifically, he contends that his counsel failed to conduct an adequate investigation to locate witnesses who might be able to offer mitigating evidence, that he failed to act to preserve the mitigating testimony that Father James was prepared to offer, that he failed to request a voir dire of juror Todd to determine her fitness to continue on the jury after her collapse, and that he

failed to object to the improper questions employed by the trial judge when one of the jurors indicated during a poll of the jury that he did not support the death sentence imposed on petitioner.

■ The Supreme Court has recently clarified the law governing ineffective assistance of counsel in *Strickland v. Washington,* —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Court established a two-prong test for analyzing such challenges. First, the defendant must establish that his counsel's performance "fell below an objective standard of reasonableness." *Id.* at ——, 104 S.Ct. at 2065. Once that threshold is crossed, the defendant must then demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at ——, 104 S.Ct. at 2068. Our own cases have established that "[e]ffective assistance does not mean errorless assistance, nor counsel judged ineffective by hindsight," *Goodwin v. Balkcom,* 684 F.2d at 804, and our determination of whether petitioner was denied effective assistance "must be based on the totality of circumstances in the entire record rather than on specific actions." *United States v. Gibbs,* 662 F.2d 728, 730 (11th Cir.1981). Thus, even if we agree that any of petitioner's complaints against his counsel is well founded, this does not necessarily mean that constitutionally ineffective assistance has been established.

With regard to the first point raised by petitioner, the Supreme Court held in *Strickland v. Washington* that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." —— U.S. at ——, 104 S.Ct. at 2066. The record does not contain direct testimony from petitioner's defense counsel concerning his trial strategy, but it is apparent from his arguments on the initial direct appeal and at the resentencing trial that he sought to persuade the jury that petitioner was less culpable in the abduction, rape, and murder of Teresa Allen than his co-ac-

cused, Carzell Moore. For example, defense counsel succeeded in winning a reversal of petitioner's initial death sentence from the United States Supreme Court on the grounds that the trial judge had improperly excluded the testimony of Thomas Pasby, which indicated that Moore had murdered the victim while Green was absent from the scene. *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979). At the resentencing trial, defense counsel stressed this point and emphasized other evidence suggesting that his client had played a secondary role, such as forensic testimony indicating that only Moore had raped the victim and the absence of any footprints in the area around the victim's body that could be traced to petitioner's shoes. In his closing argument, defense counsel contended that his client "should not be made to die for the sin of another.... He didn't kill this girl. He didn't shoot her. The other guy shot her. He didn't know he was gonna shoot her. The other man knew."

■ Thus, it appears that petitioner's counsel made a strategic decision before the resentencing trial to place his principal emphasis on the argument that petitioner was less culpable than his co-accused, rather than relying heavily on "general affirmations from family members and friends that [the defendant] had been, at a time remote from the events giving rise to the charge, a basically good and responsible child and young adult." *Stanley v. Zant,* 697 F.2d 955, 967 (11th Cir.1983). In view of the admissions favorable to his client that petitioner's counsel succeeded in extracting from Pasby and the state's forensic witnesses, we cannot say that this choice was an unreasonable one under the circumstances, and we therefore do not believe that the decision to forego an extensive investigation into petitioner's background constituted ineffective assistance of counsel. Similarly, although we have noted above that we believe that defense counsel was responsible for the failure to preserve the supposedly mitigating testimony that could have been offered by Father

James, such evidence was not essential to counsel's overall strategy, and we can infer that it would have been largely cumulative of that presented by petitioner's mother and sister, who did testify about the circumstances of his childhood and young adolescence.

■ The third point raised by petitioner concerns his counsel's failure to request a voir dire of juror Todd following her collapse in the hallway. We have addressed the circumstances surrounding the dismissal of Mrs. Todd at some length above, and it is clear that a voir dire would have revealed that she felt unable to continue with deliberations for at least the remainder of that evening. Because Mrs. Todd would therefore have been discharged by the trial judge in any event, petitioner plainly was not prejudiced as a result of his counsel's failure to request an opportunity to examine her.

Finally, petitioner contends that his counsel erred by failing to object to allegedly improper questions employed by the trial judge during the post-verdict poll of the jury. During the initial poll of the jury, the following exchange took place:

BY THE COURT: Mr. Mobley, Samuel Mobley. You have heard the verdict read, Mr. Mobley, was this your verdict in the jury room?

BY JUROR MOBLEY: Yes, it was, your honor.

BY THE COURT: Is this your verdict now?

BY JUROR MOBLEY: No, it's not, your honor. I cannot do it.

The trial judge immediately directed the jury to return to the jury room. Subsequently, the court examined bailiff Mary Sewell, who reported, "When the jurors got back to the jury room, Mr. Mobley, the black, young man said, 'I did not know what was going on. I don't know—I didn't know what polling the jury was.'" According to Mrs. Sewell, Mobley added that "he felt when they asked him, whatever the question was, that they wanted to know if he was responsible for the whole thing. Somehow he got the idea that the

question was directed to him as a person, 'Did you do this?'" The trial judge then recalled the jury and explained that "[t]o poll the jury simply means to ask the juror in open court, after that verdict has been published in court, whether or not that is his or her verdict." The trial judge then proceeded to poll the jury by saying to each juror, "You have heard the verdict published. Is this your verdict?" All of the jurors responded affirmatively.

■ Petitioner asserts that his counsel erred by failing to object to the trial judge's use of the single question, "Is this your verdict?" rather than asking "whether the verdict was both the juror's verdict in the jury room *and* was still his verdict," and by failing "to invoke settled Georgia law, under which a nonunanimous verdict in a capital case automatically requires a life sentence." We are not impressed by either contention. Neither the Georgia nor the federal courts have mandated that any particular phrasing be used by a trial judge in polling a jury. Judge Webb of the Georgia Court of Appeals noted in *White v. Seaboard Coast Line Railroad,* 139 Ga. App. 833, 229 S.E.2d 775, 777 (1976), that "[t]here is no uniformity in, nor statutory authority for, polling a jury," and he proceeded to illustrate the point by citing a variety of formulations which have been approved by Georgia courts over the years. A similar lack of uniformity is apparent in the federal courts. *See, e.g., United States v. Millican,* 600 F.2d 273, 278 (5th Cir. 1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 598 (1980) ("Is this your verdict and the verdict of the jury?"); *United States v. Sexton,* 456 F.2d 961, 962 (5th Cir.1972) ("Was it your verdict?"); *Jackson v. United States,* 386 F.2d 641, 642 (D.C.Cir.1967) ("[W]hat say you as to the defendant on count one of the indictment?"). The object of a poll of the jury is to ascertain that the verdict agreed upon in the jury room is still the unanimous verdict of the jury. *United States v. Edwards,* 469 F.2d 1362, 1366 (5th Cir.1972). Unless the trial judge's interrogation serves to coerce a reluctant juror into changing his

vote, *Sexton,* 456 F.2d at 966, any formulation that meets that end is permissible.

▆▆▆▆ Petitioner's trial counsel also did not necessarily err by failing to request that a life sentence be entered against his client after the initial poll indicated that Mobley did not support the verdict. The fact that one juror intimates that he dissents from the published verdict of the jury does not automatically require that the alternative verdict be entered. The courts have traditionally recognized that jurors are laymen who may be confused by courtroom procedure, and a trial judge may take appropriate steps—such as non-coercive questioning, *United States v. Duke,* 527 F.2d 386, 394 (5th Cir.), *cert. denied,* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1190 (1976), or directing the jury to retire for further deliberations, *Sexton,* 456 F.2d at 966–67—to ascertain whether a juror actually intended to dissent from the published verdict. The trial judge here handled the matter properly, and petitioner's trial counsel plausibly may have concluded that Mobley's initial response did in fact appear to be the product of a simple misunderstanding and that further attempts to challenge the unanimity of the verdict would prove unavailing.

We therefore conclude that petitioner's claim of ineffective assistance of counsel is without merit. Although petitioner's trial counsel may have been relatively young and inexperienced in trying capital cases, the record reveals that he conducted a spirited defense and was quite successful in extracting testimony from the state's witnesses in support of his argument that petitioner was less culpable than his co-accused. The mere fact that his efforts were ultimately unavailing is not, of course, a sufficient basis upon which to condemn his performance.

## VI. THE INFLAMMATORY EVIDENCE ISSUE

▆▆▆▆ During the resentencing trial, one of the investigating officers who had first examined the murder scene testified that a portion of the victim's ear and various other fragments of skin and bone had been found on the ground near her corpse. Over the objection of defense counsel, the desicated remains of the ear and other fragments of bone and skin were introduced into evidence by the state. Petitioner contends that the introduction of this evidence was needlessly inflammatory and prejudicial, and that the state's actions therefore violate the Supreme Court's mandate in *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977) that "any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." Although we would not wish to endorse the state's practice, this court has already held that the introduction of such evidence is permissible where it "depict[s] the scene of the crime," *Hance v. Zant,* 696 F.2d 940, 951 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983), and we are of course bound by that decision.

## VII. THE RIGHT TO SILENCE ISSUE

▆▆▆▆ Petitioner also claims that his right to remain silent under the fifth and fourteenth amendments was infringed by certain remarks of the trial judge during petitioner's closing argument to the jury. In accordance with Georgia law, the trial court had authorized petitioner to make a closing argument as co-counsel in his own behalf. During his closing, petitioner sought to persuade the jury that he could not have had the "depravity of mind" required to establish an aggravating circumstance under Off.Code Ga.Ann. § 17–10–30(b)(7). He conceded that the crime was "horrible," but then asked, "how could it cause depravity of mind on my part when I wasn't there; when I didn't have no idea that this man was going to kill this young lady. And sure, it was a horrible murder, but I did not commit the murder, so I didn't inflict the depravity of mind on my part—." At this point the trial judge interrupted and instructed the jury:

> [T]his man has not testified during the trial of the case and the State did not have an opportunity to cross examine

him and he cannot make an unsworn statement to you at this time concerning the things he's just saying. He's acting as his own co-counsel and he is allowed to argue the evidence in the case, but he cannot get before you now and give testimony or give evidence. That should have come from the stand under oath, if he desired to do it.

Petitioner argues that, even if he did stray into error during the course of his argument, the trial court went far beyond what was necessary in terms of a curative instruction and subsequently failed to cure its own error in commenting upon petitioner's failure to take the stand. In *United States v. Lepiscopo*, 429 F.2d 258 (5th Cir.), *cert. denied*, 400 U.S. 948, 91 S.Ct. 255, 27 L.Ed.2d 254 (1970), this court considered a similar argument raised by a defendant appearing pro se who had adopted the practice of making asides to the jury during his questioning of an adverse witness. After twice warning him against making unsworn statements in the presence of the jury, the trial judge rebuked the defendant by stating, "Don't make comments. You'll have your opportunity to be sworn and testify, if you care to do so." The court held that these remarks, comparable to those before us in this case, "did not constitute a comment on defendant's failure to testify but rather reflected his right to take the stand and testify under oath if he so desired." *Id.* at 260. The *Lepiscopo* court also noted that the trial judge subsequently instructed the jury that a criminal defendant has the right to testify or to remain silent. Similar instructions were given in this case. We therefore conclude that this claim is without merit.

## VIII. THE NONSTATUTORY AGGRAVATING CIRCUMSTANCES ISSUE

Petitioner also contends that the trial judge erred by permitting the state to introduce court records of his prior convictions in Alabama for burglary and assault with intent to rob as aggravating evidence. Petitioner argues that these offenses are not relevant to any statutory aggravating circumstance available under Georgia law and asserts that permitting the state to introduce such evidence is contrary to the principles of *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and prior decisions of this court. In the interval since this case was originally briefed the Supreme Court has issued decisions in *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), and *Barclay v. Florida*, —— U.S. ——, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) (plurality opinion), that seriously undermine petitioner's argument. In *Stephens*, the petitioner's death sentence had been based upon multiple aggravating circumstances, one of which—a finding that the defendant had a "substantial history of serious assaultive criminal convictions"—was subsequently invalidated on vagueness grounds by the Georgia Supreme Court. Stephens asserted that his death sentence should be vacated because the sentencing jury might have been swayed by the trial judge's jury instructions or by the evidence introduced in support of this invalid aggravating circumstance. The Court rejected this argument, noting that "[t]he underlying evidence is nevertheless fully admissible at the sentencing phase," 462 U.S. at ——, 103 S.Ct. at 2747, since the Georgia statute provides that the sentencing judge or jury "shall hear additional evidence in extenuation, mitigation, and aggravation of punishment, including the record of any prior criminal convictions." Off.Code Ga.Ann. § 17–10–2(a); *see also id.* § 17–10–30(b) (judge or jury shall consider "any mitigating circumstances or aggravating circumstances otherwise authorized by law" in addition to the specified statutory aggravating circumstances). The Court concluded:

> Nothing in the United States Constitution prohibits a trial judge from instructing a jury that it would be appropriate to take account of a defendant's prior criminal record in making its sentencing determination, [citation omitted], even though the defendant's prior history of noncapital convictions could not *by itself* provide sufficient justification for imposing the death sentence.

462 U.S. at ___, 103 S.Ct. at 2749 (emphasis in original); *see also Barclay,* — U.S. at —, 103 S.Ct. at 3427; *id.* at —, 103 S.Ct. at 3437 (Stevens and Powell, JJ., concurring). Because the jury in this case based its death sentence on a finding of two proper aggravating circumstances, we believe it is clear under *Zant v. Stephens* and *Barclay v. Florida* that there was no constitutional error here.

## IX. THE DOUBLE JEOPARDY ISSUE

Petitioner further alleges that the constitutional prohibition against double jeopardy was violated at his resentencing trial because the trial judge permitted the state to introduce evidence pertaining to petitioner's alleged rape of the victim and the theft of her automobile. Petitioner argues that his first sentencing jury had refused to find that he was guilty of the aggravating circumstances of rape or auto theft and asserts that this "finding" should stand as res judicata in future trials under *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). We disagree.

It is first necessary to clarify exactly what transpired at petitioner's original sentencing trial. Contrary to what petitioner suggests, the state did not ask for a finding that the murder had been committed in the course of a rape. Instead, it sought a finding that petitioner's crime involved the following three aggravating circumstances: (1) that the offense of murder was committed while the offender was engaged in the commission of the additional capital felonies of the kidnapping and armed robbery of Teresa Allen; (2) that the defendant committed the offense of murder for the purpose of receiving money and other things of value, namely, the victim's car; and (3) that the offense of murder was outrageously and wantonly vile, horrible and inhuman in that it involved torture to the victim and depravity of mind on the part of the defendant. The jury returned a death sentence based upon its finding that the first and third of these aggravating circumstances were present.

 It is well established under Georgia law that sexual abuse may constitute "torture" for the purpose of finding an aggravating circumstance under section 17–10–30(b)(7). *See Burger v. Zant,* 718 F.2d 979, 986 (11th Cir.1983). Thus, the jury may well have taken the alleged rape into account in its consideration of whether the crime demonstrated torture to the victim and depravity of mind on the part of the defendant. Without an implicit refusal to find petitioner guilty of rape, there clearly is no constitutional barrier to admitting evidence of the alleged rape at petitioner's second sentencing trial.

In any event, we find petitioner's reliance on *Bullington* misplaced. In *Bullington,* the Court held that "[b]ecause the sentencing proceeding at petitioner's first trial was like the trial on the question of guilt or innocence, the protection afforded by the Double Jeopardy Clause to one *acquitted* by a jury also is available to him, with respect to the death penalty, at his retrial." 451 U.S. at 446, 101 S.Ct. at 1862 (emphasis added). The Court's decision in *Bullington* therefore turned on its conclusion that a Missouri jury's verdict at the sentencing phase of a capital trial is more properly analogous to a decision on guilt/innocence than it is to a noncapital criminal sentence, stressing such differences as the use of a reasonable doubt standard and other procedural devices that *"explicitly require[ ]* the jury to determine whether the prosecution has 'proved its case.'" *Id.* at 444, 101 S.Ct. at 1861 (emphasis in original).

 One key distinction between petitioner's situation and that of Robert Bullington is immediately apparent—Bullington had been spared at his initial sentencing trial, whereas petitioner was sentenced to death at his. Since it has long been established that "there is no double jeopardy bar to retrying a defendant who has succeeded in overturning his conviction" on legal grounds, *id.* at 442, 101 S.Ct. at 1860,[2]

---

**2.** A different rule applies to cases in which the reversal is for insufficiency of the evidence.

*Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). Petitioner also cites *Ashe*

petitioner's claim must ultimately rest on an extension of the Court's reasoning in *Bullington* to encompass the argument that factual findings on statutory aggravating circumstances are also the equivalent of a jury verdict on guilt or innocence. This we decline to do. As the Georgia Supreme Court pointed out while rejecting a similar argument in *Zant v. Redd,* 249 Ga. 211, 290 S.E.2d 36 (1982), *cert. denied,* — U.S. ——, 103 S.Ct. 3552, 77 L.Ed.2d 1398 (1983):

> Aggravating circumstances are procedural safeguards designed to control a jury's discretion in capital cases in order to ensure against capricious and arbitrary enforcement of the death penalty. [Citations omitted] Aggravating circumstances are not substantive "penalties" or "offenses"; they do not place the defendant's life in peril or subject him to a possible "conviction"; they are standards which guide a jury's decision on what does place the defendant[']s life in jeopardy at the sentencing trial—the death penalty.

*Id.* 290 S.E.2d at 38. We would further note that a jury need find only a single aggravating circumstance to impose the death sentence, Off.Code Ga.Ann. § 17–10–31, and that the jury has the power to decline to impose the death penalty even if it finds that one or more statutory aggravating circumstances are present. *Id.;* *Gregg v. Georgia,* 428 U.S. at 203, 96 S.Ct. at 2939. Thus, the legal significance that attaches to a jury's decision whether to state a given aggravating circumstance in support of its verdict is simply not comparable to that of the verdict itself. We therefore conclude that the analogy the Supreme Court drew between the verdict at a guilt/innocence trial and that at a sentencing hearing cannot be extended to cover a jury's findings on statutory aggravating circumstances.

## X. THE JURY INSTRUCTIONS ISSUE

■ The considerations stated in the preceding section also require us to reject petitioner's final contention: that his fourteenth amendment right to a fair trial at the sentencing phase was violated by the trial judge's refusal to instruct the jury that a defendant is presumed innocent of aggravating circumstances. Petitioner reasons that the presumption of innocence has been recognized as an essential component of the right to a fair trial, *see Taylor v. Kentucky,* 436 U.S. 478, 479, 98 S.Ct. 1930, 1931, 56 L.Ed.2d 468 (1978), and contends that since the Supreme Court has held that "the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause," *Gardner v. Florida,* 430 U.S. at 358, 97 S.Ct. at 1204, the presumption of innocence should be applied at the sentencing phase as well.

■ As we indicated above, petitioner's argument ultimately founders upon the rocks of a false analogy between aggravating circumstances and the underlying criminal offense. First, while it is true that a Georgia sentencing jury cannot recommend the death penalty unless it finds that at least one aggravating circumstance exists beyond a reasonable doubt, Off.Code Ga. Ann. § 17–10–30(c), the jury is not required to return a death sentence whenever aggravating circumstances are found to exist. The function of statutory aggravating circumstances in Georgia is in fact quite limited: they serve to winnow down the number of cases in which the death penalty can be imposed by requiring the jury to focus its consideration on the particular circumstances of the crime. Once the jury has found that a given case is one of the limited number in which the death penalty is a possible sanction, however, its discretion in selecting capital punishment is absolute. *Zant v. Stephens,* 250 Ga. 97, 297 S.E.2d 1,

---

*v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) in support of his argument, but *Ashe* is inapposite since it applies only to cases in which multiple criminal prosecutions grow out of a single alleged criminal act. The petitioner in *Ashe,* for example, had been acquit-

ted in a prior prosecution for robbing one of the players at a poker game and was subsequently tried and convicted on another robbery charge growing out of the same event. In this case, in contrast, petitioner can point to neither a prior valid judgment nor an acquittal.

**1542**

3 (1982). Thus, while a finding of each element of an offense beyond a reasonable doubt will result in a conviction for that offense, a similar finding beyond a reasonable doubt of an aggravating circumstance will not automatically trigger a sentence of death.

Therefore, the considerations that justify the presumption of innocence at a defendant's original trial are simply inapplicable here. A defendant does not arrive at the penalty phase of a capital proceeding with a clean slate, and there is no point in pretending otherwise. The state's evidence at the original trial is usually adopted in its entirety at the sentencing proceeding, and the state's proof that the accused committed the underlying offenses usually encompasses its proof as to statutory aggravating circumstances.[3] Because the same jurors (at least in the first instance) usually make the decision on both guilt/innocence and punishment, it would elevate form over substance to instruct them that the evidence which they have just evaluated and found convincing beyond a reasonable doubt should be disregarded in favor of granting the defendant a presumption of innocence. We also note that the Supreme Court has repeatedly found that a defendant's due process rights are adequately protected by the provisions of the existing Georgia capital punishment statute, which does not create a presumption against the existence of statutory aggravating circumstances. In view of these considerations, we believe the trial court did not err in refusing to employ the instruction requested by petitioner.

### CONCLUSION

We have carefully reviewed the contentions presented by petitioner and conclude that all of them are without merit.

AFFIRMED.

---

3. For example, it would frequently be impossible to distinguish the evidence that establishes that a murder was committed from the evidence that establishes that it was committed in an "outrageously or wantonly vile, horrible or inhuman" way under Off.Ga.Code Ann. § 17–10–30(b)(7).