UNITED STATES of America, Plaintiff,

v.

William SCHARRER, Defendant.

No. 82–352–Cr.

United States District Court,
S.D. Florida,
Miami Division.

July 15, 1985.

K. Chris Todd, Neil Cartusciello, Asst. U.S. Attys., So. Dist. of New York, New York City, for plaintiff.

Atlee Wampler, Miami, Fla., for defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT SCHARRER'S POST–TRIAL MOTIONS

SPELLMAN, District Judge.

The Defendant, William Scharrer, was convicted after a jury trial of conspiring to defraud the United States, aiding and abetting Victor Posner in tax evasion, and aiding the preparation of false income tax returns in violation of Title 18, United States Code, Section 371 and 2, and Title 26, United States Code, Sections 7201 and 7206(2). Shortly after the trial, Scharrer retained new counsel and filed a series of post-trial motions alleging numerous errors.[1] For the reasons detailed below, the Court finds that all of Scharrer's post-trial motions must be denied.

### Background

"On June 14, 1983, an indictment was returned in the Southern District of Florida charging Victor Posner and Scharrer with conspiring to overvalue two parcels of real estate totaling 22 acres given by Posner to

1. Scharrer contends in his motions that this Court made numerous erroneous rulings on evidentiary matters; that this Court improperly instructed the jury; that the prosecutors engaged in various forms of misconduct; that he was denied effective assistance of counsel; that the evidence was insufficient to sustain his convictions; that there was an impermissible variance between the proof at trial and the indictment; and that the prosecutors abused the grand jury process.

This Court held extensive evidentiary hearings on Scharrer's claim that he was denied effective assistance of counsel and heard oral argument on that issue and on the sufficiency of the evidence. It reviewed the other claims on the basis of the pleadings and the record.

Miami Christian College. The indictment alleged that artificially high appraisals were made in order that Posner could evade income taxes by taking grossly inflated charitable deductions on his income tax returns. Scharrer's role in the scheme included supplying inflated real estate appraisals.

\* \* \*

"The jury trial of Posner and Scharrer commenced on July 26, 1984. On August 1, 1984, the fourth day of the trial, the Government offered the Scharrer letter into evidence. The district court ruled the letter admissible against Scharrer but inadmissible against Posner. Finding that there was no way to protect Posner from the trial jury's consideration of the letter as evidence against him, the district court then granted Posner's motion for severance. The proceedings against Scharrer continued, and the jury eventually returned a verdict of guilty as to all four counts charged against him."[2]

### The Evidence at Trial

A. The Government's Case

The Government contended that William Scharrer provided two real estate appraisals to Victor Posner in a scheme to evade $1.2 million of Posner's income taxes. Scharrer's appraisals falsely inflated the value of a 16-acre tract and a 6-acre tract of land that Posner donated to the Miami Christian College ("MCC" or "the College"), and deducted as charitable contributions on his income tax returns. In Scharrer's first appraisal in December 1975, he inflated the true per acre value of the 16-acre tract from $33,000 to $125,000. And in December 1978 he falsely increased the true value of the 6-acre tract from $44,000 an acre to $175,000 an acre.

The Government demonstrated Scharrer's knowledge of the true value of the property by showing that he and his real estate company, Oscar E. Dooly, had been long familiar with the subject property and its true fair market value prior to December 1975. Moreover, in 1976 and 1977 Scharrer became increasingly more aware of the per acre value through the attempts by the Miami Christian College to sell the 16 acres. Scharrer also became aware of the lower value of the 16 acres from Leonard Bisz, another real estate appraiser, who refused to complete a formal appraisal at $93,000 per acre because he did not believe that the land was worth that much.

The evidence at trial further showed that in a July 29, 1976, letter, Scharrer admitted that the $125,000 per acre value was "unrealistic" and conceded that at best the land was worth $50,000 an acre. As the months passed, however, Scharrer learned that the depressed real estate market in Dade County would not support even the $50,000 an acre amount. Indeed, as of September 1977, Scharrer's company, Oscar E. Dooly, was offering the property for sale at $35,000 an acre. Finally, a willing buyer agreed to pay $32,000 an acre.

The evidence also showed that Scharrer warned Posner of the sale. Posner first threatened to sue the College if the sale was completed. When the College was undeterred, Posner sued and immediately tied up any future sales effort by filing a *lis pendens* on the land. At about this same time, Posner told the president of Miami Christian College, Dr. Kenneth Gangel, that even if he lost the lawsuit, he would tie up any future sales for years by litigating the matter to the highest courts.

Thereafter, in the spring of 1978, Scharrer recommended that the College settle Posner's lawsuit, and in September 1978 a settlement agreement was reached that prevented any sale of the land for five years. On April 16, 1979, Scharrer provided Posner with the second appraisal, this time on 6 acres of the subject property. The per acre value was inflated from $44,000 to $175,000.

2. *U.S. v. Posner,* 764 F.2d 1535 (11th Cir.1985) Opinion filed July 12, 1985, affirming the inadmissibility of letter as to Posner.

This evidence was augmented by the testimony of two expert witnesses, Eugene Gracer and Michael Cannon. Gracer testified that as of December 1975, the 16 acres was worth $33,000 per acre and that as of December 1978, the 6 acres had a value of $44,000 an acre. Gracer's appraisals were based upon the theory of highest and best use. Cannon testified that Scharrer's appraisal of the 16 acres was "misleading." Mr. Cannon also testified that between 1978 and 1981 real estate prices in Dade County had "escalated dramatically." For example, sales of new homes had increased by 100 percent and the per acre cost of land had doubled.

Finally, the evidence showed that five years after Scharrer had valued the 16 acres at $125,000 per acre and three years after he had valued the 6 acres at $175,000 per acre—and after a three-year period of dramatic improvement in the real estate market—the subject property was sold for $125,000 per acre.

In addition to the proof that Scharrer knew that his appraisals were grossly inflated, the evidence further showed the history of the relationship between Scharrer and Posner, including Scharrer's attendance at parties on Posner's yacht and numerous correspondence sent to Posner by Scharrer. The evidence also established that Scharrer attempted to curry favor with Posner in a number of ways, including the fact that Scharrer permitted Posner's "close personal" friend, Brenda Nestor, to sell real estate under the brokerage license of Scharrer's real estate company.

## B. The Defense Case

Scharrer testified at length and attempted to explain the discrepancy between the values in his appraisals and the values proved in the Government's case-in-chief. His principal explanation was that it was reasonable for him to believe, and he did honestly believe, that the highest and best use of the subject property was for commercial purposes, and his appraisals were thus fair and accurate.

Scharrer also called three expert witnesses, an urban land planner, a real estate appraiser, and a lawyer. The urban land planner, Paul Stutsman, testified that the 37-acre tract of land at the corner of 104th Street and 117th Avenue (which contained the 16 and 6-acre subject property) was suitable for commercial development, and that as of December 1975, it was his opinion that obtaining a zoning change to accommodate such commercial use was feasible. The real estate appraiser, A.H. Blake, complemented Stutsman's testimony by agreeing that it was reasonable to assume as of December 1975 that the 37-acre tract could be rezoned for commercial use. Blake thus valued the 37-acre tract at $106,000 per acre as of December 1975.

On cross-examination, however, both Stutsman and Blake admitted that their assignments were to provide opinions about the 37-acre tract as a whole, not the 16 acres and 6-acre parcel. Indeed, upon further cross-examination, Stutsman concluded that because of the isolated location of the 6-acre tract, it was less valuable and a plan for just the 6 acres was not reasonable. The lawyer, Leon Black, testified that Leonard Bisz was an extremely conservative real estate appraiser, and that it is common for real estate appraisers honestly to hold widely different valuation opinions concerning the same property.

In addition to the witnesses called by Scharrer, he was able, through cross-examination of the Government's witnesses, to establish his good character. He elicited that he had an impeccable reputation in the community. He was even able to elicit specific good deeds that he had performed, including "his dedication and service at the Riverside Baptist Church" and the fact that he had "done more work for charities than any other man [the witness had] ... ever known." Scharrer supplemented these specific good deeds by testifying that he "was a Sunday School teacher for ten years, and became a deacon about fifteen years ago and served as chairman of the Board of Deacons for two years."

*The Sufficiency of the Evidence*

█ Scharrer contends that the evidence was insufficient to prove his criminal intent and that this Court should therefore enter a judgment of acquittal on all counts. This Court cannot agree.

It is well established that on a motion for judgment of acquittal:

> [T]he test is whether, taking the view most favorable to the Government, a reasonably-minded jury could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.

> \* \* \* \* \* \*

> The same test ... should apply whether the evidence is direct or circumstantial.

*United States v. Warner,* 441 F.2d 821, 825 (5th Cir.), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971); *accord Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Johnson,* 730 F.2d 683, 688 (11th Cir.1984); *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B) (*en banc), aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

All credibility choices and reasonable inferences must be drawn in favor of the Government. *United States v. Johnson,* 730 F.2d at 688; *United States v. Gonzalez,* 719 F.2d 1516, 1521–22 (11th Cir.1983); *United States v. Miller,* 693 F.2d 1051, 1053 (11th Cir.1983). In sum, the standard is whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d at 549. In this Court's opinion, the evidence detailed above was certainly sufficient to show that Scharrer intended to commit the crimes charged in the indictment.

However, the sufficiency of the evidence on Count IV, aiding and abetting Victor Posner in tax evasion, presents a somewhat more serious issue. For in order to convict Scharrer of aiding and abetting, sufficient evidence had to be presented for a reasonable jury to find beyond a reasonable doubt that Victor Posner knew that the charitable deduction he took on his 1978 income tax return was based upon a falsely inflated appraisal of the 6-acre tract, and that he took this deduction with the intent to evade taxes.

*The Evidence of Posner's Guilt*

But again, a careful analysis of the evidence demonstrates that it was sufficient to establish such knowledge and intent. The evidence, when viewed in the light most favorable to the Government, revealed the following:

In 1967 Posner bought approximately 600 acres of land in Southwest Dade County for $2500 per acre. Five years later, Posner signed a contract to sell 37 of these acres (which included the 16 and 6-acre parcels at issue in this case) to a real estate developer, Alex Courtelis, for $38,000 per acre. Courtelis subsequently determined that he could not develop the land commercially because he could not obtain rezoning. When he was not able to sell the property, Courtelis deeded it back to Posner in February 1975 in lieu of foreclosure, thus sacrificing his $100,000 initial payment and an interest payment of $50,000. (Since he would have had to pay $35,324 per acre to complete the purchase, it is reasonable to infer that he did not think that the property was worth even that much.) Thus, in 1975, Posner had his property back. The Government presented evidence that the real estate market was depressed in 1975 and that the 16-acre parcel was valued as of December 1975 at $33,000 per acre.

Posner agreed to donate 16 of these acres to the Greater Miami Jewish Federation on the condition that the Federation provide an appraisal. Posner told the Federation that the land was extremely valuable and in his opinion was worth $100,000 per acre. When the Federation refused to accept the donation on these conditions, Posner turned to Scharrer who produced an appraisal at $125,000 per acre. The land was donated to the Miami Christian College at the end of December 1975.

In September 1977, Scharrer informed Posner that the College was attempting to sell the 16 acres he had previously donated. Initially, the College had offered to sell the land for $50,000 per acre. Since that offer generated no prospective buyers, the College lowered the asking price to $35,000 per acre.

Posner took quick action when he learned that the College was negotiating to sell the property. On September 22, 1977, Posner himself telephoned the president of MCC and threatened to sue the College if it went forward with its efforts. Posner told the president that he would "go all the way to the Florida Supreme Court." He emphasized that it would make no difference whether he won or lost because, at the very least, he could "tie up the sale of the land for at least five years."

Posner sued MCC and filed a *lis pendens* on the 16 acres. This prevented a sale of the property and concealed its fair market value—the price upon which a willing buyer and seller had settled after negotiations. The lawsuit was based on the claim that he had donated the 16 acres subject to it being used as a college campus. The Government presented evidence that this claim was false—there were no restrictions placed on the donation.

On April 22, 1978, Scharrer presented a motion to the MCC Board of Trustees to negotiate the settlement of Posner's lawsuit and on November 12, 1978, a settlement was signed. Under the terms of the settlement, the College would not sell the land for five years.[3]

Approximately seven weeks after the settlement agreement, Posner donated another 6 acres to MCC. The 6 acres were contiguous to the 16 acres Posner had given to MCC in 1975, and were expressly made subject to the restriction that it not be sold until November 1, 1982.

In his donation letter to the College, Posner set the value of the 6 acres at over $1 million ($175,000 per acre). Several weeks later, Posner's attorney wrote to Scharrer, reminding him that Posner had set this $1 million figure. Scharrer provided an appraisal letter dated April 16, 1979, that supported the $175,000 per acre amount. Posner claimed a value of $175,000 per acre on his 1978 tax returns and reduced by $147,830 the amount he had to pay the IRS for that year.[4] For the next year, 1979, Posner used the $175,000 per acre figure to reduce his taxes by $275,055.

Finally, Posner's income tax returns, which were admitted into evidence, show that Posner had quite a healthy income during the years in question, and it therefore would be reasonable to assume that he would be in need of deductions.

From this evidence, a jury could infer that Posner was well aware of the fair market value of the property and that his conduct in bringing the lawsuit and his stated goal of preventing a sale for five years was an attempt to conceal the true value of the property. When the evidence is viewed in the light most favorable to the Government, a jury could certainly find beyond a reasonable doubt that Posner knew the $175,000 per acre figure was grossly inflated and that he used this figure in an attempt to evade taxes.

*Ineffective Assistance of Counsel*

Scharrer also attacks his conviction on sixth amendment grounds, claiming ineffective assistance of counsel. Alleging that he had agreed "against his better judgment" to accept payment of his attorney's fees by his co-defendant, Scharrer now claims that this fee arrangement deprived him of conflict-free and adequate representation. According to Scharrer, his attorney's preparation and decision making were impaired because of "subtle influences of [his attorney] relying on the stat-

---

**3.** Posner's attorneys attempted to have the court file sealed but were unsuccessful.

**4.** Because the Internal Revenue Code limits the amount a taxpayer can deduct for charitable

contributions in any one year, Posner could not use the entire donation in the 1978 tax year. He thus carried forward the remaining portion as a deduction in 1979.

ure, preparation, and abilities of [Posner's attorney] Edward Bennett Williams ... and the subtle influences of the fee arrangement." Scharrer expressly states, however, that he "does not allege conscious disloyalty of his former counsel and does not allege fraud or deceit on the part of his former counsel or counsel for his co-defendant."

The standards for assessing a post-trial claim that a conflict of interest rendered counsel's assistance ineffective are well defined. A defendant who raised no conflict of interest objection at trial must satisfy two requirements. He must show, *first*, that his attorney was "actively representing" interests other than his own, and *second*, that such other interests were "actually conflicting."

> Once a [defendant] shows that his trial counsel (1) actively represented (2) (actually) conflicting interests, he has established the constitutional predicate for an ineffective assistance of counsel claim.

*Westbrook v. Zant*, 743 F.2d 764, 769 (11th Cir.1984)(parentheses in original) (hereinafter *"Westbrook II"*) (quoting *Westbrook v. Zant*, 704 F.2d 1487, 1499 (11th Cir.1983) (*"Westbrook I"*) ); *accord, Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980); *United States v. Ard*, 731 F.2d 718, 726 (11th Cir.1984); *United States v. Panasuk*, 693 F.2d 1078, 1080 (11th Cir.1982). In this case, Scharrer has failed to make either showing.

As to the first requirement, Scharrer has not shown that his attorney, Hugh Culverhouse, Jr., was actively representing any other interests. Although Victor Posner may have agreed to underwrite Mr. Culverhouse's fees,[5] there is no evidence that Mr. Culverhouse ever viewed his allegiance as owing less than totally to Scharrer. Payment of a criminal defense attorney's fees by a third party does not imply that the attorney will ignore his duty of loyalty to the defendant. *See, e.g., Kelley v. Alabama*, 636 F.2d 1082, 1084 (5th Cir. Unit B 1981); *United States v. Hoffer*, 423 F.Supp. 811, 818 (S.D.N.Y.1976), *aff'd*, 556 F.2d 561 (1977).

Moreover, Scharrer went into this arrangement with his eyes open. He testified that he had fully agreed to having Posner pay his legal fees.[6] He also testified that he had consulted with several attorneys and friends about the propriety of the arrangement before agreeing to it. The fact is that when Scharrer agreed to the arrangement, Culverhouse had been ostensibly discharged because of the defendant's inability to personally pay his fee.

Scharrer also has failed to satisfy the second requirement for establishing an unconstitutional conflict of his trial counsel's interests, since he has shown no "actual conflict" between his interests and Posner's. The joint representation of co-defendants, by itself, raises only the "possibility of conflict," which "is insufficient to impugn a criminal conviction." *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719. A greater showing is required to establish an "actual conflict."

With respect to the interests of co-defendants, the test of an actual conflict in this circuit is as follows:

> An actual conflict exists when the respective defenses of multiple defendants are inconsistent, i.e., if "introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant...."

*United States v. Mers*, 701 F.2d 1321, 1328 (11th Cir.1983) (quoting *Baty v. Balkcom*, 661 F.2d 391, 395 (5th Cir. Unit B 1981), *cert. denied*, 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982) ); *accord, Barham*

---

**5.** The evidence presented at the hearing this Court conducted on Scharrer's motion established that Posner never actually agreed to pay Scharrer's legal fees. Rather, Posner's attorney, Edward Bennett Williams, told Scharrer that he would recommend to Posner that he pay the fees.

**6.** Scharrer even wrote directly to Posner requesting that he be reimbursed for certain legal expenses.

*v. United States* 724 F.2d 1529, 1531 (11th Cir.1984); *United States v. Carter*, 721 F.2d 1514, 1536 (11th Cir.1984); *Westbrook I*, 704 F.2d at 1499.

Moreover, the defendant alleging an impermissible conflict of interest bears the burden of establishing from the record specific instances of actual conflict. He "must make a factual showing of inconsistent interests." *Mers*, 701 F.2d at 1328. And he must show that his attorney " 'made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other.' " *Id.* (quoting Comment, *Conflict of Interests in Multiple Representation of Criminal Co-Defendants*, 68 J.Crim.L. & Criminology 226 (1977)). Unless the attorney made such a choice, " 'the conflict remained hypothetical' " *id.*, and there is no constitutional violation.

Scharrer's main contention that there was an actual conflict concerns Culverhouse's failure to adduce evidence about a revised appraisal he did on the 6-acre tract. But there is no evidence that this failure was motivated by any concern for Posner's interests.

At trial, the Government introduced Scharrer's April 16, 1979, letter to Posner in which he had appraised Posner's December 29, 1978, gift to the MCC at $175,000 per acre. Neither the Government nor Culverhouse, however, chose to offer the October 16, 1980 appraisal report in which Scharrer had reduced his valuation of $125,000 per acre. Scharrer speculates that Culverhouse's motive was to avoid a possible detriment to Posner, because Posner had "never amended his tax returns to correspond with" the reduction.

This argument, on its face, does not withstand scrutiny. Since Posner will be tried separately, it would make no difference to him that evidence of the October 16, 1980, appraisal report was left out of Scharrer's trial. The Government could still choose to offer the report at a later trial against Posner.

There were also sound—indeed, compelling—reasons for Culverhouse to avoid any mention of Scharrer's October 1980 reduction of his valuation to $125,000 per acre. To begin with, Scharrer wrote the revised appraisal after he was informed that a federal grand jury was investigating his appraisal of the 16-acre tract. Thus, the timing of the appraisal itself is suspicious and gives the appearance that Scharrer was merely attempting to forestall an investigation of his later appraisal.

Moreover, Scharrer's explanation for the revised appraisal is problematic. According to Scharrer, when he did the $175,000 per acre opinion letter, he had not realized that the access to the land had been blocked by earthen buildup for construction of an overpass above the turnpike extension. Only when he visited the site months later did he realize that the value of the land would have to be reduced because it had no access.

This explanation is difficult to credit when viewed in conjunction with Scharrer's other testimony at trial. Scharrer testified that he had been familiar with Posner's entire 37-acre tract in 1975, because he "had been searching the area for ten years for sites for Ryder Systems, the Riverside Baptist Church, [and] Miami Christian College." In fact, he had been so familiar with the 37 acres that he did not even need to look at a survey or map when Posner first proposed the donation in November or December of 1975—so familiar that he took it upon himself to recommend which 16-acre portion of the 37-acre tract Posner should donate. Scharrer thus knew of the overpass above the turnpike extension, which, as shown by the January 1976 aerial photograph, had been completed before then.

Culverhouse testified that he made a tactical decision not to bring out any evidence of Scharrer's revised appraisal report because he believed Scharrer's explanation to be incredible. This Court finds that Culverhouse's decision represented sound

strategy and was not in any way motivated by any concern for Posner, or for his fees.[7]

Indeed, the record fails to show any specific instance in which Scharrer's attorney was forced to choose between divergent interests of Posner and Scharrer. To the contrary, the record shows that both Posner and Scharrer at the outset, and throughout this case, perceived that the benefits of a "united front" outweighed those of pursuing possibly divergent interests.

It is plain that Scharrer received important benefits from pursuing a common defense strategy. Posner could have simply pointed his finger and claimed that he had relied on Scharrer's "expert" opinion. Instead, Posner supported Scharrer's defense. In his opening statement, Posner's counsel, Edward Bennett Williams, praised Scharrer and discussed his outstanding reputation in the community and as an expert in real estate. He also supported the appraisals and promised the jury that the defense would demonstrate that those appraisals were correct.

Thus, in agreeing to pursue a common defense, Scharrer got the freedom from an antagonistic co-defendant, as well as something even more valuable. He obtained, at no cost to himself, not one but several talented attorneys.

Scharrer continued to benefit even after Posner was severed from the case, for even then, Posner had a strong incentive to aid Scharrer's defense. An acquittal of Scharrer would have measurably strengthened Posner's ability to negotiate with the Government. Additionally, after an acquittal, Scharrer would have made an excellent defense witness. Posner obviously recognized these incentives, in that he had three attorneys from his own defense team remain at the trial, after the severance, to assist Culverhouse.

Scharrer has thus wholly failed to establish any actual conflict between his and Posner's interests. There were no "antagonistic defenses." *Ard*, 731 F.2d at 726. Nor has Scharrer argued that but for the fee arrangement, he would have adopted "a strategy of shifting blame" to Posner. *Carter*, 721 F.2d at 1537.

In sum, Scharrer has failed "to show that his counsel sacrificed" any of this interest for Posner's. *Id.* His claim that his counsel had a conflict of interest rendering his representation unconstitutional, therefore, must be rejected.

■ Scharrer also points to other areas such as Culverhouse's failure to present character witnesses, additional testimony concerning land valuation and zoning, and the subsequent sales history of the property as further examples of Culverhouse's alleged inadequate representation. Because Scharrer has not even attempted to show that Culverhouse failed to present this evidence because it conflicted with Posner's interests, it must be evaluated under the standards recently articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). According to the Court:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in

---

7. In the Court's opinion, the real tactical error was made by the Government in not cross-examining Scharrer about the change. When the Government announced "No further questions," Culverhouse must have thought he had snatched victory out of the jaws of defeat. The defendant's joy was short lived.

the adversary process that renders the result unreliable.

The Court further explained that the proper standard for determining the first component, whether the attorney's performance was deficient, is "an objective standard of reasonableness" to be measured in light of "prevailing professional norms." *Id.* at 2065. The Court cautioned, however, that:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance....

*Id.* at 2065–66 (citations omitted).

In this case, Culverhouse's conduct criticized by Scharrer did not fall outside "the wide range of reasonable professional assistance."

■ The fact that Scharrer's new attorney can find fault with certain tactical decisions of Scharrer's trial attorney does not establish ineffective assistance. The reasonableness of trial decisions must be judged as of the time they are made, not through the "distorting effects of hindsight." But even more importantly, it must be remembered that:

There are countless ways to provide effective assistance of counsel in a given case. Even the best criminal defense

attorneys would not defend a particular client in the same way.
*Id.* at 2066.

The defense Scharrer received was carefully executed and Scharrer's trial attorney was a vigorous advocate. "The mere fact that his efforts were ultimately unavailing is not ... a sufficient basis upon which to condemn his performance." *Green v. Zant,* 738 F.2d 1529, 1538 (11th Cir.1984).

### *The Remaining Issues*

The other issues raised by Scharrer are also without merit. The Court finds that the conduct of the prosecution during the trial was entirely fair and proper, that this Court correctly instructed the jury, and that there was no impermissible variance between the indictment and the proof at trial. Moreover, this Court finds that there was no abuse of the grand jury process that would warrant dismissal of the indictment. Accordingly, Scharrer's post-trial motions are denied in their entirety; and the defendant is set for sentencing at 9:00 a.m. on September 20, 1985.