**Levis Leon ALDRICH,**
**Petitioner-Appellant,**

v.

**Louie L. WAINWRIGHT,**
**Respondent-Appellee.**

**No. 84–5523.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 19, 1985.

Richard H. Burr, II, Craig S. Barnard, Asst. Federal Public Defenders, West Palm Beach, Fla., for petitioner-appellant.

Joy Shearer, Asst. Atty. Gen., West Palm Beach, Fla., for respondent-appellee.

Before RONEY, FAY and JOHNSON, Circuit Judges.

RONEY, Circuit Judge:

Levis Leon Aldrich was convicted of first degree murder in Florida and sentenced to death. In this appeal from the denial of his federal habeas corpus petition, he raises three claims: (1) that he received ineffective assistance of counsel at his trial; (2) that the trial judge erred by not instructing the jury on second degree felony murder; and (3) that the trial judge excluded doubt about Aldrich's guilt as a nonstatutory mitigating factor at Aldrich's capital sentencing hearing. We affirm.

Since the three-day trial in January 1975, in which the jury found Aldrich guilty of murder in connection with an armed burglary, his conviction and death sentence, in which the court followed the jury's recommendation, have been subject to much litigation in the state courts.[1]

In June 1983, Aldrich filed his first federal habeas corpus petition. Although many grounds for relief were asserted, all have apparently dropped by the way except the three issues asserted by able and experienced counsel on this appeal.[2]

## I. INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL

The ineffective assistance of counsel claim turns essentially on whether this Court should reverse the decision of the state courts and the federal district court that the failure to take discovery depositions and to properly investigate the case prior to trial did not work to the defendant's substantial disadvantage.

Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant alleging ineffective assistance of counsel must establish two components: that his attorney's performance was deficient and that the deficient per-

---

1. The Florida Supreme Court affirmed. *Aldridge v. State*, 351 So.2d 942 (Fla.1977) (per curiam), *cert. denied*, 439 U.S. 882, 99 S.Ct. 220, 58 L.Ed.2d 194 (1978). An application for relief pursuant to *Presnell v. Georgia*, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978) was denied in an unreported order by the Florida Supreme Court, and the United States Supreme Court denied certiorari. *Aldridge v. Florida*, 449 U.S. 891, 101 S.Ct. 251, 66 L.Ed.2d 118 (1980). Aldrich's motion to vacate the conviction was denied after an evidentiary hearing, and that denial was affirmed. *Aldridge v. State*, 425 So.2d 1132 (Fla.1982) (per curiam), *cert. denied*, 461

U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 315 (1983). Aldrich's original petition for habeas corpus in the Florida Supreme Court was likewise denied. *Aldridge v. Wainwright*, 433 So.2d 988 (Fla. 1983) (per curiam) Petitioner's name has been spelled Aldridge throughout the state court proceedings, but Aldrich in these federal proceedings.

2. The grounds Aldrich asserted in the state court proceedings are summarized in the attached Appendix.

formance was prejudicial to the defense. *Id.* at ——, 104 S.Ct. at 2064–65, 80 L.Ed.2d at 693; *see also King v. Strickland,* 748 F.2d 1462, 1463 (11th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985). Failure to establish either prong of the *Washington* standard will result in denial of defendant's Sixth Amendment claim. *Washington,* 466 U.S. at ——, 104 S.Ct. at 2069–70, 80 L.Ed.2d at 699–700. Although a district court's findings of fact are subject to the clearly erroneous rule, "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* at ——, 104 S.Ct. at 2070, 80 L.Ed.2d at 700.

The state post-conviction court found after a full evidentiary hearing that counsel's failure to investigate or depose the State's key witnesses was a substantial and serious deficiency measurably below that of competent counsel. The Florida Supreme Court stated:

> The trial judge found that appointed counsel's failure to take formal depositions under the criminal rules was a substantial and serious deficiency. Although we agree that the failure to take depositions requires an inquiry, it does not necessarily follow that this conduct in itself necessitates a finding of ineffective assistance of counsel or prejudice to appellant.

*Aldridge v. State,* 425 So.2d 1132, 1136 (Fla.1982) (per curiam), *cert. denied,* 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 315 (1983). Without denying the finding that the conduct of counsel was wanting, the court went on to affirm the trial court on the ground there was no showing of the required prejudice. The federal district court, after reviewing the state record, stated:

> It cannot be questioned that appointed counsel's failure to adequately prepare Petitioner's case by taking oral depositions of the State's main witnesses, most notably witnesses Strickland and Sapp, resulted in representation at trial *not*

reasonably likely to render effective assistance.

Although the State continues to argue that Aldrich has failed to meet this first prong of the *Washington* test, the record fully supports the findings of the other courts in this regard. At the evidentiary hearing conducted in the state post-conviction proceedings, Aldrich presented the testimony of three attorneys who had worked on his case: Bruce Wilkinson, Willie Gary, and Elton Schwarz. At the time of Aldrich's trial all three were working at the Public Defender's office for the Nineteenth Judicial Circuit.

Their testimony established that public defenders Wilkinson and another lawyer were assigned to represent Aldrich shortly after his September 9, 1974 arrest. Within the next two weeks, the attorneys and an investigator contacted a clerk at the hotel where Aldrich had been staying, the record keeper at the community work release center, and Jo Ann DeSamarais, a bar owner and potential alibi witness. In late October Aldrich, dissatisfied with the progress of the investigation, demanded new counsel. The court arranged for Elton Schwarz, the head Public Defender, to represent Aldrich.

Burdened by numerous other cases and administrative duties, Schwarz assigned the actual preparation of the case to Willie Gary, a legal intern in the Public Defender's office who did not become licensed to practice law until December 20, 1974. Gary, functioning as an assistant to Schwarz, also had a heavy workload. He spent time familiarizing himself with the case file, and he also went with an investigator to talk to Jo Ann DeSamarais at her bar.

Schwarz tried another capital case in December 1974, and only turned to devote attention to Aldrich's upcoming capital murder trial a week or two before it was scheduled to commence on January 6, 1975. Four days before the trial, Schwarz moved for a continuance. A hearing was held on the motion on the morning of January 6. Schwarz represented to the court that he was unprepared for trial, that he had just

completed another capital case, that no depositions of the State's witnesses had been taken, that no one from the Public Defender's office had examined the State's physical exhibits, and that he needed an additional 30 days to conduct depositions and otherwise prepare the case. Later, Schwarz testified at the post-conviction hearing that he fully expected to get the continuance as it was the first his office had requested in the case, and the trial judge in the past had been sympathetic to the workload of the Public Defender's office. Schwarz relied on the fact that in his previous experience no capital case had gone to trial in less than four months, and several other capital cases were set prior to Aldrich's. In reliance on his expectation that the continuance would be granted, Schwarz had set depositions of the State's witnesses for the following week. Defense counsel testified they were "caught sleeping" by the denial of the continuance.

After the hearing, the court denied the continuance on the ground there had already been ample time for preparation. The court did not make any finding that the case actually had been properly prepared. That same day, the three-day trial began.

At the 1981 post-conviction hearing, Schwarz testified unequivocally that he was "totally unprepared" to try Aldrich's case. Schwarz stressed that during the period immediately before Aldrich's trial, the Public Defender's office was carrying the heaviest caseload it had ever had, including numerous other capital cases. Schwarz said he never recalled "going to trial even on a misdemeanor case in the state of readiness we were in at that time." If ever again forced to go to trial in similar circumstances, Schwarz said he would either seek to withdraw as counsel or, if not allowed to withdraw, "stand mute."

Schwarz, Gary, and Wilkinson, as well as an expert witness, all testified that depositions were essential to the preparation of a capital murder case and that the failure to take depositions constituted a serious deficiency in the preparation of Aldrich's defense. There was no indication that the failure to depose any of the State's witnesses was a strategic decision on the part of the defense. *See Washington,* 466 U.S. at ——, 104 S.Ct. at 2066, 80 L.Ed.2d at 695; *Mitchell v. Kemp,* 762 F.2d 886, 889–90 (11th Cir.1985) (holding incomplete investigation of potential mitigating witnesses a strategic choice by defense counsel); *Green v. Zant,* 738 F.2d 1529, 1536 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 827, 83 L.Ed.2d 716 (1984) (defense counsel's strategic decision to "forego an extensive investigation into petitioner's background" held not ineffective).

The State argues that the real basis of this claim is the denial of the continuance, and it contends that any such challenge is barred by procedural default. The denial of a continuance was not asserted as an issue on district appeal. The basis of the ineffective assistance claim, however, is the failure to take depositions and to investigate, not the failure to obtain a continuance. The finding that the attorney's performance was deficient and that Aldrich thus met the first prong of *Washington* must be accepted by this Court.

The question, then, is whether Aldrich has shown the prejudice that is required to obtain relief for ineffective assistance of counsel. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at ——, 104 S.Ct. at 2067, 80 L.Ed.2d at 696. Aldrich must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at ——, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

■ Initially, we reject Aldrich's suggestion that this is a case where prejudice should be presumed. Prejudice can be presumed where there is an actual or constructive denial of counsel altogether, for whatever reason. *Strickland v. Washington,* 466 U.S. at ——, 104 S.Ct. at 2067, 80

L.Ed.2d at 696; *see also United States v. Cronic*, 466 U.S. 648, —— & n. 25, 104 S.Ct. 2039, 2047 & n. 25, 80 L.Ed.2d 657, 668 & n. 25 (1984). Prejudice can also be presumed if there is a fundamental breakdown in the adversarial process. *See Blake v. Kemp*, 758 F.2d 523, 533 (11th Cir.1985) (noting that "presumption of prejudice would be proper where counsel's representation was so deficient as to amount in every respect to no representation at all"). The record reveals, however, that although the attorneys wanted to take depositions and conduct further investigation, a good deal of work was done on the case during the four months between arraignment and trial. Counsel was appointed soon after Aldrich's arrest. The State furnished the witnesses' sworn statements to the defense in October 1974, and the Public Defender's investigator reviewed the evidence with the prosecutor. The defense contacted several witnesses and took two statements from a key alibi witness, Jo Ann DeSamarais, in September and December. Gary worked in conjunction with the investigator in preparing for the trial. Thus there was a significant amount of preparation and investigation of the case by several people prior to trial.

■ The trial transcript reveals that Schwarz vigorously represented Aldrich at trial. Schwarz himself characterized his representation of Aldrich as follows:

It was as effective as we could provide, taking into consideration the time constraints, the case load, and all of the other circumstances; the lack of experienced attorneys in my office.

The expert witness that Aldrich called at the evidentiary hearing on the effectiveness issue stated that "[t]hroughout the proceeding Schwarz did an admirable job in trying to try the case by the seat of his pants." Schwarz cross-examined the State's witnesses, impeached some of the most critical ones, and made effective closing arguments. Presenting Aldrich to testify to his alibi defense, Schwarz chose not to call other corroborating witnesses because the information to which he had ac-

cess reflected that the potential alibi witnesses could not testify to Aldrich's whereabouts at the precise time of the crime and because by presenting such witnesses he would forego the advantage of opening and closing arguments. This is simply not the kind of case where there has been such a constructive denial of counsel or a breakdown in the adversarial process that prejudice can be presumed. To obtain relief, the defendant must show specific instances of actual prejudice.

■ Aldrich stresses three main areas of specific prejudice: first, that identifiable areas of evidence were left undeveloped, primarily facts and witnesses relating to Aldrich's alibi and facts about the relationship between two main witnesses against Aldrich, Norman Sapp and Charles Strickland; second, that substantial impeachment of various witnesses, including Sapp, Strickland, the security guard, and the restaurant owner could have been ascertained through deposition and utilized at trial; and third, that counsel's lack of investigation led him to engage in "fishing expeditions" on cross-examination that resulted in improper evidence being addressed, including Sapp's testimony that he had been threatened and evidence of various collateral offenses committed by Aldrich as well as his prison and military AWOL records. Aldrich argues that these specific instances of prejudice, coupled with the circumstantial nature of the State's case against him, combine to create "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland v. Washington*, 466 U.S. at ——, 104 S.Ct. at 2069, 80 L.Ed.2d at 698.

In considering these allegations of prejudice, a brief review of the facts will be helpful. At 12:05 A.M. on Tuesday, September 3, 1974, Robert Ward telephoned his wife from his father-in-law's restaurant in Fort Pierce, where he worked, to tell her he had finished closing up and was on his way home. At 12:14 A.M., sheriff's deputies responded to the restaurant's burglar alarm. When they arrived five minutes

later, they discovered Ward's body lying outside the locked back door of the restaurant next to his car. He had been killed by one or more shotgun blasts to the head. Thus the murder had taken place between 12:05 and 12:20 A.M.

The combination safe inside the restaurant office was open and empty, and the receipts of the night, estimated by the owner as between $600 and $900, were missing. Ward's keys were on a desk in the office. The burglar alarm switch to the office door was set, but the one on the back door was not.

While law enforcement officers investigated the crime scene, a deputy noticed a white Chrysler driving slowly along the highway in front of the restaurant about 2:00 A.M. His suspicions aroused, the deputy pursued and stopped the car, which was driven by petitioner Aldrich. Aldrich had between $500 and $600 in cash stuffed into his four pockets, including many one dollar bills. Officers then accompanied Aldrich back to the hotel room in which he had been staying since his release from prison on August 27, 1974. There, Aldrich showed the officers a receipt for $558.58 that he had received from the Department of Corrections upon his release. He also produced a receipt for $200 he had paid for his car on August 27, 1974.

The authorities continued their investigation, eventually discovering several witnesses whose stories tended to implicate Aldrich. The murder weapon, which had been broken apart, was recovered from two local waterways. On September 9, 1974, Aldrich was arrested, and on October 17, 1974 he was indicted for the murder of Robert Ward.

At the January 1975 trial, the State presented a number of witnesses whose testimony established a strong circumstantial case against Aldrich. A security guard who was working the night shift at a business located near the restaurant where the killing occurred testified that Aldrich's car careened out of a trucking company lot next door and nearly ran over her at 1:00 A.M. on the night of the murder. The restaurant owner testified that he had employed Aldrich at the restaurant as a dishwasher earlier in 1974 while Aldrich was in a prison work release program but that he had fired Aldrich for "exceeding his authority." A cook at the restaurant testified that Aldrich had told her he intended to come back and rob the restaurant when he obtained his release from prison, and that he knew how to shut off the burglar alarm. The cook also stated that Ward, the murder victim, had befriended Aldrich while he worked at the restaurant.

Some of the most damaging testimony came from James Norman Sapp and Charles Strickland, both of whom had met Aldrich in prison prior to the murder. Sapp said Aldrich had told him he intended to rob the restaurant because he had received inadequate pay while employed there. According to Sapp, Aldrich had told him he had purposefully set off the burglar alarm while working at the restaurant to check the police response time. Sapp said he gave his story to the police after receiving threatening calls a few days after the murder.

Strickland testified that Aldrich had called him at 6:45 P.M. on September 2 and asked to borrow a gun to go deer hunting. At 7:30 P.M., Strickland met Aldrich at a parking lot in Fort Pierce and delivered a shotgun and five shells. Later that evening, Strickland drove Lillie King to the hospital between the hours of midnight and 1:00 A.M. After returning home, Strickland got a call about 1:30 A.M. from Aldrich, saying he had had to kill a man. The next day, Aldrich called Strickland and asked him to help recover the shotgun from the trucking company lot near the restaurant, at which time Aldrich told Strickland he had killed a man at the restaurant because the man had tried to remove his mask. Strickland testified that after retrieving the gun he cleaned it, broke it down, and threw it into two separate ditches. Later, however, he led police to where he had disposed of the gun.

Strickland's testimony was somewhat confirmed by other witnesses. Two young

girls, 9 and 14, who lived in the house where Strickland was staying testified they accompanied Strickland to a parking lot on September 2 and saw him deliver the gun to a man whom Strickland later told them was Aldrich. Lillie King testified that Strickland drove her to the hospital to meet her boyfriend at 11:50 P.M. on September 2 and dropped her off at her boyfriend's car at 12:40 A.M. on September 3.

Aldrich was the sole defense witness. He asserted an alibi defense, claiming absolute noninvolvement in the crime. According to his testimony, he went fishing until 10:30 or 11:00 P.M. the night of September 2. He then went to a bar until 1:30 or 2:00 A.M. He claimed that when stopped by the police in front of the restaurant at 2:00 A.M., he was on his way to visit a woman from whom he hoped to rent a room.

Aldrich correctly asserts that his allegations of prejudice must be considered in light of this factual background. First, with respect to the allegation that undiscovered evidence was not presented, there has never been any evidence proffered in either the state or the federal post-conviction proceedings that could have been discovered and presented at the trial. Other than the speculation of the attorneys, no witnesses were called, no affidavits offered and no statements presented at the post-conviction hearing to indicate anyone would testify to anything that would have clearly corroborated Aldrich's alibi or supported Schwarz's speculation that "Strickland and Sapp are the ones that were principally involved." In its review of the case on appeal from post-conviction proceedings, the Florida Supreme Court noted this absence when it stated "[a]ppellant has made no attempt whatever to present any evidence to indicate what information would have been elicited in taking the depositions which would have affected the outcome of his trial." *Aldridge v. State*, 425 So.2d at 1136. Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation. Although counsel may have been pressed for time in January 1974, the intervening decade should have revealed whatever evidence it is contended should have been discovered prior to trial.

Aldrich asserts that "perhaps the single most critical area of the case that went wholly unexplored" is the relationship between Strickland and Norman Sapp and Strickland's potential motive for committing the robbery. Strickland was living with Norman Sapp's brother, Leonard, and Leonard's wife and children. These living arrangements had been made by Norman after he and Strickland were released from prison. Before the trial, Aldrich told his counsel that Strickland was having an affair with Leonard's wife. Strickland allegedly told Aldrich that he wanted to run off to North Carolina with Leonard's wife and therefore needed money. Strickland also allegedly asked Aldrich to commit a robbery for him at a store where Strickland knew the clerk, and when Aldrich refused, this allegedly precipitated hard feelings between Strickland and Aldrich.

This evidence is argued to show that Strickland had a motive for committing the robbery himself. This is insufficient to show it would have created "a reasonable probability" of reasonable doubt respecting guilt. There is nothing shown that would impugn the testimony of Lillie King that Strickland was with her at the time of the murder.

██ Second, the failure to interview or take the depositions of the State's witnesses for impeachment purposes is not prejudicial *per se*. *See McCleskey v. Kemp*, 753 F.2d 877, 900 (11th Cir.1985) (*en banc*) (holding no prejudice shown where attorney failed to interview two of State's witnesses and potential defense witnesses); *Boykins v. Wainwright*, 737 F.2d 1539, 1543 (11th Cir.1984) (holding no prejudice shown where attorney failed to interview prosecution's expert witnesses), *cert. denied*, — U.S. ——, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985); *Solomon v. Kemp*, 735 F.2d 395, 402 (11th Cir.1984) (holding no prejudice shown where attorney failed to talk to all of the State's witnesses and did

not seek funds for an investigator), *cert. denied,* — U.S. ——, 105 S.Ct. 940, 83 L.Ed.2d 952 (1985). Discovery depositions in criminal cases were not authorized by rule in Florida until 1968. *In re Florida Rules of Criminal Procedure,* 196 So.2d 124 (Fla.1967) (per curiam). They are not authorized by rule in federal courts.

Aldrich has not identified any specific information that would have been revealed by depositions or interrogatories and would have added to the impeachment of the State's witnesses. On cross-examination at the post-conviction hearing, both attorneys who represented Aldrich at trial were unable to point to any fact learned at trial, or later, that might have been discovered by deposition, and stated that they could not think of anything that surprised them at trial. Both Sapp and Strickland were exposed to substantial impeachment by defense counsel. The jury was aware that both witnesses had criminal records. Counsel established that Strickland had previously lied under oath, that he had violated his parole, and that he owned the murder weapon. Given this substantial impeachment of the testimony and credibility of Strickland, who furnished the only direct evidence that Aldrich committed the murder, the collateral matters Aldrich now asserts should have been explored do not create a reasonable probability that the jury would have given less credence to Strickland's testimony. Similarly, counsel's suggestion that Joyce Marshall and Al DiVagno could have been "pinned down" by deposition and more easily tested by cross-examination at trial is speculative. In any event, counsel had available the means to question Marshall's testimony that Aldrich's car drove by at 1:00 A.M., since her sworn statement showed that she saw the car between 12:00 and 12:30 A.M.

Finally, Aldrich has not established that he was prejudiced by the admission of evidence which he now argues his attorney should have sought to exclude. *See Messer v. Kemp,* 760 F.2d 1080, 1090 (11th Cir. 1985). The link between these alleged failures of counsel to make objection at trial and the failure to conduct adequate pretrial investigation is too tenuous to require a reversal of the finding of no prejudice.

Given Aldrich's failure to demonstrate prejudice under the standards of *Strickland v. Washington,* the district court properly denied habeas corpus relief on this ground.

## II. SECOND DEGREE FELONY MURDER CHARGE

Aldrich claims that under *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and *Hopper v. Evans,* 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), the trial judge violated Aldrich's due process rights when he did not instruct the jury on the lesser included offense of second degree felony murder. At the outset, it strains credulity that Aldrich would raise such a claim now and, moreover, that he would repeatedly characterize the fact that the trial judge did not deliver such a charge as a "refusal." A review of the trial transcript reveals not only that Aldrich never requested the second degree felony murder instruction at trial, but that he and his attorney both objected vociferously but unsuccessfully to the trial judge's earnest attempts to instruct the jury on any lesser included offenses.

At the close of the evidence, Aldrich submitted a motion to the trial judge that included the following specific request:

> That the Court charge the jury only on the offense of murder in the first degree as charged in the amended indictment filed herein and not include any charge as to any lesser included offense other than that of not guilty.

When questioned by the trial judge, Aldrich explained that he submitted the motion because he did not want to be convicted of an offense that would send him back to prison. The court initially stated an intention to grant the motion, but then after additional argument the following colloquy took place:

> THE COURT: Excuse me for interrupting you [spoken to defense counsel]. I think the simplest thing to do, and the

thing for me to do is to deny the defendant's request that the matter be submitted solely on murder in the first degree and not guilty, and require verdicts in second and third degree and manslaughter.

MR. SCHWARZ [defense counsel]: Defendant objects to that, Your Honor.

THE COURT: Well, you certainly can.

MR. SCHWARZ: I object to the reading of any definition of degrees of homicide other than murder in the first degree.

The court proceeded to instruct the jury on the lesser degrees of murder, but it gave no instruction on second degree felony murder.

Even overlooking the fact that Aldrich was opposed to any instructions on lesser included offenses, his claim lacks merit. In *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the Court held unconstitutional an Alabama statute prohibiting a trial judge from giving a lesser included non-capital offense charge in a capital case where the defendant had testified that he participated in the robbery but, casting the blame on his accomplice, consistently denied killing the robbery victim or intending his death. In *Hopper v. Evans*, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), the Supreme Court held there was no due process violation in failing to give a lesser included offense instruction in a capital case where there was no evidentiary basis to support a finding of such offense. *See also Spaziano v. Florida*, —— U.S. ——, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). Florida law prohibits instructions on lesser included offenses where there is no evidence to support a conviction on the lesser included offense. *See Hitchcock v. Wainwright*, 745 F.2d 1332, 1341 (11th Cir.1984), *on pet. for reh'g and reh'g en banc*, 745 F.2d 1348 (11th Cir.1985).

■ Under Florida law, "liability for second degree felony murder occurs when the individual perpetrates the underlying felony as an accessory before the fact but does not personally engage in it." *Adams v.*

*State*, 341 So.2d 765, 768 (Fla.1976) (per curiam), *cert. denied*, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 158 (1977). Aldrich suggests that the jury could have disbelieved both his own alibi testimony claiming no involvement whatsoever in the crime and the testimony of Strickland directly implicating Aldrich as the triggerman and then, using the testimony of other witnesses, constructed its own theory that Aldrich was somehow an accessory before the fact. Neither Aldrich nor his counsel in any way suggested such a theory to the jury. The evidence at trial was insufficient to show facts necessary for a second degree felony murder conviction. No such instruction was constitutionally required.

## III. FAILURE TO CONSIDER NONSTATUTORY MITIGATING CIRCUMSTANCES

■ Aldrich's final contention is that the only mitigating factor present in his case, residual doubt about his guilt, was not considered by the trial judge or jury at the capital sentencing proceeding. This point was not asserted at trial or on appeal and is barred by procedural default under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), there being no showing of cause and prejudice, as held by the district court.

Aldrich expressly requested at sentencing that no mitigating circumstances be presented to the jury, stating he preferred the death penalty to spending more time in prison. On direct appeal, the Florida Supreme Court stated "the trial court found no mitigating circumstances and Aldridge does not contest that finding on appeal." *Aldridge v. State*, 351 So.2d 942, 944 n. 4 (Fla.1977) (per curiam), *cert. denied*, 439 U.S. 882, 99 S.Ct. 220, 58 L.Ed.2d 194 (1978). Issues that could be, but are not, asserted on an appeal of a criminal conviction are foreclosed from collateral attack in state court, and therefore barred from consideration in federal court. *Ford v. Strickland*, 696 F.2d 804, 816 (11th Cir.) (*en banc*) (per curiam), *cert. denied*, 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983).

When Aldrich attempted to raise the claim for the first time in his motion for post-conviction relief, the trial court denied relief on the basis that the grounds raised "have already been presented or should have been presented in his direct appeal." The Florida Supreme Court affirmed the denial of relief except with regard to the ineffective assistance of counsel claim and remanded the case for an evidentiary hearing on that issue. *Aldridge v. State,* 402 So.2d 607 (Fla.1981); *see also Aldridge v. State,* 425 So.2d 1132, 1136 (Fla.1982), *cert. denied,* 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 315 (1983). Thus, the state courts have uniformly held Aldridge's mitigating circumstances claim to be procedurally barred. The district court correctly held that there was a procedural default under *Wainwright v. Sykes.*

In a footnote to his brief on appeal, Aldrich now argues the district court should not have relied on a procedural bar because the State failed to assert that defense in response to Aldrich's federal habeas corpus petition. We need not decide whether such state action would make the district court's decision erroneous. Aldrich raised in his federal petition as a single ground that a nonstatutory mitigating factor was not considered and that the trial court's inquiry into Aldrich's waiver of the presentation of mitigating evidence was constitutionally inadequate. The State responded that no state court had refused to consider any mitigating factor and that the waiver issue was barred by procedural default. A fair reading of the State's response compels a conclusion that the State continued to assert the procedural default defense in federal court.

The procedural default on this issue precludes review on the merits unless cause and prejudice would excuse Aldrich's default. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed. 594 (1977). Aldrich can show no cause that would excuse the default. Like the petitioner in *Shriner v. Wainwright,* 715 F.2d 1452, 1457 (11th Cir. 1983), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1328, 79 L.Ed.2d 723 (1984), Aldrich asked the court to allow him to waive the sentenc-

ing proceeding and sentence him to death because he did not want to spend more time in prison. Although the court denied the motion, Aldrich's lawyer presented no mitigating circumstances, and apparently in accordance with his client's wishes made the following argument to the jury:

As I indicated, ladies and gentlemen, my client has not asked for me to plead for an advisory opinion for life imprisonment. Under the statute, as Mr. Stone has made out, on a capital offense such as this, a life sentence requires the serving of—a mandatory serving of a minimum of twenty-five calendar years before even being eligible for parole. Mr. Aldrich has spent ten years in the state prison. He has no desire to spend the rest of his life there. He has, therefore, asked me and I will accede to his wishes and not request that there be mitigating circumstances presented.

The jury returned a recommendation of death, and the court, after affording another opportunity for argument on Aldrich's behalf, imposed the death sentence. No argument was ever made that a nonmitigating factor of whimsical doubt should be considered, although surely the jury and judge were well aware that the case against Aldrich was largely circumstantial.

The failure to establish any cause for failure to raise the issue at trial or on appeal forecloses further consideration of this claim. The district court's denial of Aldrich's petition for habeas corpus is

AFFIRMED.

### APPENDIX

In Aldrich's direct appeal of his conviction, he argued for reversal on the following points:

1. Introduction of an objectionable and inflammatory photograph of the victim.

2. Direction to the jury that it must find an unanimous verdict, allegedly depriving Aldrich of his right to a "hung" jury.

3. Reading of instructions to the jury which had the net effect of barring a conviction for second degree felony murder.

4. Aldrich also asserted the unconstitutionality of the death penalty statute and alleged error by the trial judge in describing the crime as heinous and atrocious in the judge's written findings of aggravating and mitigating circumstances.

*Aldridge v. State*, 351 So.2d 942 (Fla.1977) (per curiam), *cert. denied*, 439 U.S. 882 [99 S.Ct. 220, 58 L.Ed.2d 194] (1978).

In November 1979 Aldrich filed a Rule 3.850 motion in the trial court. Aldrich alleged the execution of the death sentence would deprive him of due process of law and constitute cruel and unusual punishment for the following reasons:

1. The sentencing judge allowed the jury to consider, and the sentencing judge expressly relied upon aggravating factors which are not encompassed by the state statute.

2. The sentencing judge's instructions in the penalty phase constituted a direct and prejudicial comment on the evidence.

3. Aldrich's sentence of death was upheld on appeal on the basis of aggravating circumstances that were not found by the sentencing judge.

4. The Florida Supreme Court failed to remand for resentencing where mitigating circumstances were found by the sentencing judge and the only aggravating factor found by the sentencing judge was not sustained on appeal.

5. The sole aggravating circumstance found by the sentencing judge in support of Aldrich's death sentence was not sustained on appeal and is not supported by the evidence and the ruling case law.

6. The sentencing judge and the Florida Supreme Court failed to weigh the nonstatutory mitigating factor of doubt about Aldrich's guilt.

7. The sentencing judge imposed the death sentence immediately, and without reflection, after the jury returned its advisory sentencing verdict.

8. The sentencing judge failed to inquire of Aldrich regarding the purported waiver of the fundamental constitutional right to present evidence and argument in mitigation, with the result that there is no basis in the record for determining whether such a purported waiver was voluntarily and intelligently made.

9. No aggravating circumstances were alleged in the indictment in the present case and no notice of aggravating circumstances that the State intended to charge was otherwise given, resulting in the denial of the fundamental due process requirement of notice of charges and lack of jurisdiction for the sentencing court to impose the death sentence.

10. The Florida death penalty statute is unconstitutional on its face and as applied because no standard of proof is required for the overall weighing process in determining whether the death sentence is appropriate; and no standard for weighing the aggravating and mitigating circumstances was employed in this case.

11. The aggravating circumstances are applied in Florida in an inconsistent, overboard, arbitrary and vague manner.

12. Execution by electrocution is a cruel and unusual punishment.

13. The death penalty is imposed in Florida is an arbitrary, capricious, and discriminatory manner based upon race, geography, poverty, sex and other arbitrary factors.

14. The circumstantial evidence in the present case was insufficient to sustain a verdict of guilt and is wholly insufficient to support the taking of a human life.

Aldrich also alleged he was denied the effective assistance of counsel in both the guilt and sentencing phases, asserting:

1. Counsel was unprepared or prevented from being prepared for trial and to render effective assistance.
2. There were strong conflicts between the office of the Public Defender and Aldrich which precluded an adequate relationship.
3. Counsel failed to adequately consult with Aldrich and investigate evidence and/or witnesses suggested by Aldrich.
4. Aldrich's primary attorney was inexperienced in handling capital cases.
5. Counsel emphasized and made a feature of Aldrich's criminal record during the trial.
6. Counsel failed to produce a key alibi witness until after the trial.
7. Counsel failed to object to introduction of evidence obviously unrelated to any statutory aggravating circumstances and to jury instructions wherein the court commented to the jury on the weight of the evidence.
8. Counsel failed to adequately consult with Aldrich regarding the purported waiver of the fundamental right to present evidence and argument in mitigation of the death sentence.
9. Appellate counsel failed to raise various points although there was "an arguable chance of success with regard to these contentions."

On June 18, 1981, the trial court denied Aldrich's Rule 3.850 motion without conducting an evidentiary hearing. On July 7, 1981, the Florida Supreme Court entered an order holding that an evidentiary hearing was required on the issue of effectiveness of counsel but affirming as to the other allegations. *Aldridge v. State,* 402 So.2d 607 (Fla.1981).

After the evidentiary hearing, the trial court denied Aldrich's motion to vacate. The Florida Supreme Court affirmed. *Aldridge v. State,* 425 So.2d 1132 (Fla.1982) (per curiam), *cert. denied,* 461 U.S. 939 [103 S.Ct. 2111, 77 L.Ed.2d 315] (1983). In its opinion, the Florida Supreme Court addressed the following arguments:

1. That Aldrich had been deprived of effective assistance of counsel by the assignment of a nonlawyer to represent him during pretrial preparations.
2. The refusal to appoint an attorney from outside the public defender's office.
3. Counsel's failure to raise on appeal the issue of the denial of the public defender's motion for a continuance.
4. Specific acts and omissions on the part of appointed counsel, particularly the failure to depose witnesses.

Finally, reviewing Aldrich's petition for a writ of habeas corpus, the Florida Supreme Court considered four grounds raised by Aldrich:

1. The Florida Supreme Court unconstitutionally applied the principle of law established in *Elledge v. State,* 346 So.2d 998 (Fla.1977), which requires the court when it finds one or more aggravating circumstances improper to remand unless there are no mitigating circumstances.
2. The Florida standard jury instructions which direct the trial judge to instruct the jury on all lesser degrees of homicide render the capital sentencing scheme unconstitutional.
3. The Florida standard jury instructions which present to the jury in the penalty phase all of the statutory aggravating factors are erroneous and create fundamental error.
4. The standard jury instruction which directs how the jury should arrive at the recommended penalty is written in a manner that makes Florida's capital punishment scheme violative of the Eighth and Fourteenth Amendments.

The Florida Supreme Court rejected all of these grounds. *Aldridge v. Wainwright,* 433 So.2d 988 (Fla.1983) (per curiam).

**642**

JOHNSON, Circuit Judge, dissenting:

I agree with the majority's conclusion that the failure of petitioner's counsel to take any depositions or to conduct a meaningful pretrial investigation constituted errors so serious that counsel was "not functioning as the counsel guaranteed by the Sixth Amendment." . *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, I conclude that because petitioner was prejudiced by his counsel's lack of preparation and trial errors, petitioner was denied effective assistance of counsel.

To demonstrate "prejudice" under *Strickland v. Washington*, the petitioner must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.*, 104 S.Ct. at 2068. In determining whether the petitioner was prejudiced by counsel's errors, a reviewing court must consider "the totality of the evidence before the judge or jury," and that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 2069.

Petitioner was convicted on the basis of evidence that was far from strong. No physical evidence implicating Aldrich was recovered at the scene of the killing. While in custody, Aldrich made no statements resembling a confession. The only direct evidence implicating Aldrich was testimony from a convicted felon who had violated the terms of his parole and lied to police investigators, and who was the other most likely suspect in the crime. It is in light of this record that counsel's errors take on their full significance.

This case required the jury to unravel and choose between two conflicting versions of a murder. The jury heard testimony from several people who said that Aldrich had told them of his intent to rob Al DiVagno's restaurant, where the murder victim worked. The prosecution's most important testimony, however, was provided by Charles Strickland, who had been a roommate of Aldrich in prison. Strickland testified that Aldrich borrowed a shotgun from him on the evening of September 2, 1974, and that Aldrich said he wanted to use the gun for deer hunting. According to Strickland, Aldrich later asked him for help in retrieving the weapon. Strickland claimed Aldrich told him that, in the course of the robbery, Aldrich had to shoot Robert Ward, an employee of the restaurant, because Ward "tried to pull off his mask." A security guard who worked nearby testified that she was almost run over by Aldrich's vehicle at about 1:00 a.m. that night. Another witness, who lived in the same house as Strickland, testified that Strickland was with her from 11:50 p.m. on September 2 to 12:40 a.m. on September 3, during which time the murder occurred.

Aldrich testified that, on the night in question, he was fishing until approximately 10:30 or 11:00 p.m., and that he then went to JoAnn's Quarter Bar, where he stayed until after 1:30 a.m. At this time, he left the bar for the home of a woman from whom he had just agreed to rent a room. He testified that he needed to finalize the rental, and that the woman had said that she often stayed awake until 3:00 or 4:00 a.m. On the way to this woman's home, Aldrich drove slowly by DiVagno's restaurant, looking for the right road.

Aldrich testified that, shortly thereafter, he was stopped by police who were investigating an incident at DiVagno's restaurant. During questioning, he showed the police $500–$600 he had in his possession and explained that he had saved the money from payments for work received from the prison road camp. Aldrich testified that he subsequently went with police to his apartment, where he permitted them to search his room and belongings and showed them the payment voucher for the money from the correctional center. Aldrich also testified that, during the period just preceding the robbery of the restaurant, Strickland had asked his help in robbing a grocery store at the store's closing time. Aldrich refused, stating that it had taken a long time to get out of prison and that he was

trying to stay out. Aldrich testified that this response started an argument between the two men.

By his own admission, Aldrich's counsel, Public Defender Elton Schwarz, went to trial "totally unprepared." He had no knowledge of the State's case or the evidence the State was likely to present at trial. He had failed to depose any of the State's witnesses, and had undertaken only minimal investigation: only three individuals had even been approached. Schwarz barely had any knowledge of Aldrich's case: his office had hardly begun to review the papers in the case until two weeks before the trial. His investigator had contacted only one person with information relating to Aldrich's alibi defense. Four days before the trial, Schwarz moved for a continuance. At the hearing on the continuance motion, conducted on the day the trial was to begin, Schwarz advised the court: "This case is not prepared. We are not in a position to provide competent legal representation." Schwarz testified at the habeas corpus hearing that he believed the continuance would be granted, and he had scheduled depositions of the State's witnesses for the following week. The court denied the motion for continuance. Schwarz later stated that "I don't recall going to trial, even on a misdemeanor case, in the state of readiness that we were in at that time."

At the trial, the jury had the opportunity to hear the State's version of what happened but, in effect, never heard Aldrich's side of the case. Because his counsel had not spoken with the State's witnesses, Aldrich did not have the benefit of effective cross-examination that is critical to the fact-finding process. Also, because of his inadequate preparation, Aldrich's counsel failed to present evidence that would have supported Aldrich's alibi.

Although there was testimony corroborating Strickland's account, if Strickland's testimony had been anticipated, counsel could have brought out information that would have strongly impeached Strickland's credibility. Strickland had told Aldrich that he was planning to leave for North Carolina with the wife of Leonard Sapp, the brother of Aldrich's former roommate, Norman Sapp, and that he needed money in order to make the move. It was for this purpose that he asked Aldrich to help him rob a grocery store. Strickland was apparently angered not only by Aldrich's refusal to help him in this effort, but also by Aldrich's failure to approve of Strickland's relationship with Sapp's wife. Strickland thus had a motive both to commit the crime himself and to place the blame on Aldrich, which motive Aldrich's counsel did not attempt to develop at trial.

Several other facts tended to impeach Strickland's credibility. Strickland was on parole from prison, and had been granted immunity for his testimony. He owned the murder weapon, in violation of the terms of his parole. Also, when the prosecutor first spoke with Strickland after the crime, Strickland falsely told him that his gun had been stolen. Strickland later changed this story and led the police to the place where he had disposed of the gun. If the defense counsel had deposed Strickland before he testified, counsel could have been free at trial to fully exploit Strickland's vulnerability. However, because Schwarz did not know what answers to expect from Strickland, he could not risk asking many of the questions that might have broken down Strickland's credibility and caused the jury to disbelieve his testimony.

Strickland was not the only witness whose testimony might have been shaken by effective cross-examination. Norman Sapp, who testified that Aldrich had said he intended to rob the restaurant, was not investigated or deposed prior to the trial. The defense did not even have a statement from Sapp—it knew nothing about him. Thus, his testimony could not be effectively challenged. The security guard who testified that she saw Aldrich's car also could not be effectively challenged. Although she testified that she saw what looked like Aldrich's car driving through her plant at exactly 1:00 a.m. on the night of the offense, a summary presented at the prelimi-

nary hearing indicated that she would testify that the time she saw the car was between 12:00 and 12:30 a.m. However, without having first deposed her, the defense could not know where to find inconsistencies in her testimony.

As a result of its inadequate investigation, the defense also failed to present evidence corroborating Aldrich's claim that he was in a bar at the time of the homicide. Although the owner of the bar made a post-trial affidavit saying that Aldrich was in her bar at the time of the crime, she was not called to testify.

Because he did not know what to expect from the State's witnesses, Schwarz's cross-examinations were largely fishing expeditions that did his client more harm than good. His cross-examination of Norman Sapp unexpectedly brought out the fact that Sapp had received threatening phone calls after the offense. Had counsel known what to expect, he could have prevented this inadmissible and possibly prejudicial testimony. Through cross-examination of another witness, Schwarz inadvertently brought out Aldrich's entire criminal record in specific detail, which testimony also was inadmissible.

Counsel's lack of preparation might also have harmed Aldrich at the penalty phase. The State presented testimony by a police investigator that the owner of JoAnn's Quarter Bar had told police that Aldrich had not been in the bar on the night of the homicide. The defense did not call the bar owner to rebut this hearsay statement. In fact, the defense presented no argument or evidence whatsoever in mitigation of punishment.

This is not the kind of case where, no matter how counsel performed, the outcome would undoubtedly have been the same. There was no one piece of conclusive evidence, such as a voluntary confession, that would have precluded an effective defense. Nor was there an overwhelming amount of evidence from which a jury could draw but one conclusion. Rather, the outcome depended on which of two stories the jury believed, where there were substantial reasons to disbelieve either one.

The majority cannot justify its position as one of deference to the jury, because the issue is not whether the jury, based on a review of all the facts, came to the right conclusion. The issue here is whether the jury was improperly denied the opportunity to have and consider the facts. Because of his counsel's lack of preparation, Aldrich's story has never really been presented before a jury. If Aldrich had been represented by competent counsel, there is in my judgment a reasonable probability that a jury would have believed his version and found him innocent.

Accordingly, I dissent.